# 15-2334-cv(L), 15-2465-cv(XAP)

# United States Court of Appeals

*for the*

## Second Circuit

FRIENDS OF THE EAST HAMPTON AIRPORT, INC.,
ANALAR CORPORATION, ASSOCIATED AIRCRAFT GROUP, INC.,
ELEVENTH STREET AVIATION LLC, HELICOPTER ASSOCIATION
INTERNATIONAL, INC., HELIFLITE SHARES, LLC, LIBERTY
HELICOPTERS, INC., SOUND AIRCRAFT SERVICES, INC.,
NATIONAL BUSINESS AVIATION ASSOCIATION, INC.,

*Plaintiffs-Appellees-Cross-Appellants,*

– v. –

TOWN OF EAST HAMPTON,

*Defendant-Appellant-Cross-Appellee.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK IN CASE NO. 2:15-CV-2246-JS-ARL
JOANNA SEYBERT, UNITED STATES DISTRICT JUDGE

## BRIEF AND SPECIAL APPENDIX FOR DEFENDANT-APPELLANT-CROSS-APPELLEE TOWN OF EAST HAMPTON

W. ERIC PILSK
KAPLAN, KIRSCH & ROCKWELL, LLP
1001 Connecticut Avenue, NW, Suite 800
Washington, DC 20036
(202) 955-5600

KATHLEEN M. SULLIVAN
DAVID M. COOPER
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Defendant-Appellant-Cross-Appellee*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT ........................................................................1

STATEMENT OF JURISDICTION...................................................................1

ISSUES PRESENTED........................................................................................2

STATEMENT OF THE CASE............................................................................2

    A.    Statutory Background...........................................................................3

    B.    The Town Of East Hampton And East Hampton Airport....................6

    C.    Early Steps To Address The Noise Problem.........................................7

    D.    The Recent Escalation Of The Noise Problem ....................................8

    E.    The Town's Analysis And Debate ......................................................10

    F.    The Local Laws ..................................................................................17

    G.    Regulatory History Of The Airport....................................................18

    H.    Plaintiffs' Complaint .........................................................................20

    I.    The District Court's Decision ............................................................20

SUMMARY OF ARGUMENT .........................................................................23

STANDARD OF REVIEW ...............................................................................25

ARGUMENT ....................................................................................................26

I.    THE DISTRICT COURT CORRECTLY RULED THAT PLAINTIFFS HAVE NO VALID CLAIM UNDER THE AAIA OR ANCA, BUT THE ANCA RULING SHOULD BE AFFIRMED ON THE ALTERNATIVE GROUND THAT THERE IS NO PRIVATE RIGHT OF ACTION TO ENFORCE ANCA...............................................27

    A.    Plaintiffs Have No Statutory Right Of Action ...................................28

B.    Plaintiffs Have No Right Of Action Under The Supremacy Clause ............................................................... 29

C.    Plaintiffs Have No Right Of Action Under Equity Jurisdiction ........ 29

D.    Plaintiffs Have No Valid Claim Under ANCA .................................. 33

II.    THE DISTRICT COURT ERRED IN GRANTING A PRELIMINARY INJUNCTION AGAINST THE ONE-TRIP LIMIT BECAUSE THAT LIMIT IS REASONABLE AND THUS NOT PREEMPTED ........................................................... 35

A.    The District Court Erred In Applying A "Least-Restrictive-Alternative" Test To Decide The Reasonableness Of The One-Trip Limit ........................................................... 36

B.    The District Court Erred In Holding The One-Trip Limit Unreasonable ........................................................... 41

1.    The Process, Data, And Analysis Underlying The Adoption Of The One-Trip Rule Establish Its Reasonableness ........................................................... 41

2.    The District Court Failed To Provide Any Persuasive Basis For Questioning The Reasonableness Of The One-Trip Limit ........................................................... 44

CONCLUSION ........................................................... 50

CERTIFICATE OF COMPLIANCE ........................................................... 51

# TABLE OF AUTHORITIES

**Page**

## Cases

*Armstrong v. Exceptional Child Center, Inc.*,
135 S. Ct. 1378 (2015)..................................................................24, 27, 29, 30

*Bellikoff v. Eaton Vance Corp.*,
481 F.3d 110 (2d Cir. 2007) ...............................................................26

*Bernal v. Fainter*,
467 U.S. 216 (1984)..........................................................................36

*British Airways Bd. v. Port Authority of N.Y.*,
558 F.2d 75 (2d Cir. 1977) ........................................................35, 37, 45

*Comm. to Stop Airport Expansion, et al. v. Dep't of Transp., et al.*,
No. 03-CV-2634 (E.D.N.Y.)...............................................................19

*D.D. ex rel. V.D. v. N.Y. City Bd. of Educ.*,
465 F.3d 503 (2d Cir. 2006) ...............................................................25

*Drake v. Laboratory Corp. of Am. Holdings*,
458 F.3d 48 (2d Cir. 2006) ................................................................26

*Friends of the East Hampton Airport, Inc. v. FAA*,
No. 9:15-CV-00441(JS)(ARL) (E.D.N.Y.) .............................................20

*Global Int'l Airways v. Port Auth. of N.Y & N.J.*,
727 F.2d 246 (2d Cir. 1984) ...............................................................45

*Helicopter Ass'n Int'l, Inc. v. F.A.A.*,
722 F.3d 430 (D.C. Cir. 2013)............................................................43

*McCasland v. City of Castroville*,
514 F. App'x 446 (5th Cir. 2013) ........................................................28

*Metro. Taxicab Bd. of Trade v. City of N.Y.*,
615 F.3d 152 (2d Cir. 2010) ...........................................................26, 27

*Nat'l Bus. Aviation v. Naples Airport*,
162 F. Supp. 2d 1343 (M.D. Fla. 2001).............................................40, 47

*Nat'l Helicopter Corp. v. City of New York*,
137 F.3d 81 (2d Cir. 1998) ..........................................................passim

*Nat'l Helicopter Corp. v. City of New York*,
952 F. Supp. 1011 (S.D.N.Y. 1997) ....................................................38

*Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*,
414 U.S. 453 (1974).......................................................................27

*Red Earth LLC v. United States*,
  657 F.3d 138 (2d Cir. 2011) ...................................................26

*Santa Monica Airport Ass'n v. City of Santa Monica*,
  659 F.2d 100 (9th Cir. 1981) ..................................................40

*SeaAir NY, Inc. v. City of New York*,
  250 F.3d 183 (2d Cir. 2001) ........................................40, 46, 47

*Seminole Tribe of Florida v. Florida*,
  517 U.S. 44 (1996) ...................................................................30

*W. Air Lines, Inc. v. Port Auth. of N.Y. & N.J.*,
  817 F.2d 222 (2d Cir. 1987) ..................................................28

*Zervos v. Verizon New York, Inc.*,
  252 F.3d 163 (2d Cir. 2001) ..................................................26

## Statutes

28 U.S.C. § 1292(a)(1) .................................................................2

28 U.S.C. § 1331 .........................................................................1

49 U.S.C. § 2210(a) ...................................................................28

49 U.S.C. § 41713(b) .............................................................4, 22

49 U.S.C. § 41713(b)(1) ..............................................................3

49 U.S.C. § 41713(b)(3) .................................................22, 33, 36

49 U.S.C. § 47107 ...............................................................20, 28

49 U.S.C. § 47107(a) .................................................................18

49 U.S.C. § 47524 ...............................................................31, 32

49 U.S.C. § 47524(b) ..................................................................4

49 U.S.C. § 47524(c) ..........................................................5, 6, 21

49 U.S.C. § 47524(c)(1) .............................................................32

49 U.S.C. § 47524(c)(2) .............................................................33

49 U.S.C. § 47524(e) .....................................................6, 31, 32

49 U.S.C. § 47526 ...............................................................31, 32

49 U.S.C. § 47531 .......................................................................32

49 U.S.C. § 47533 .......................................................................32

Town of E. Hampton Code § 75-38(A)(4)(a) ........................................17

Town of E. Hampton Code § 75-38(B) ................................................17

Town of E. Hampton Code § 75-38(C) ................................................17

Town of E. Hampton Res. 2015-411 ..................................................17

Town of E. Hampton Res. 2015-412 ..................................................17

Town of E. Hampton Res. 2015-413 ..................................................17

Town of E. Hampton Res. 2015-569 ..................................................17

## PRELIMINARY STATEMENT

This action involves a dispute over laws enacted by Defendant-Appellant Town of East Hampton (the "Town") governing the use of the East Hampton Airport, which is owned and operated by the Town. Plaintiffs-Appellees Friends of the East Hampton Airport, Inc. *et al.* ("Plaintiffs") are a group of aviation companies and aviation service companies that use the East Hampton Airport. This appeal arises from a decision of the U.S. District Court for the Eastern District of New York (Seybert, J.) granting in part and denying in part Plaintiffs' motion for preliminary injunction seeking to stop the Town, on federal preemption grounds, from enforcing local laws designed to stop excessive airport noise and its negative effects on the peace and tranquility of the community.

While the district court correctly rejected the challenge in principal part, upholding the Town's laws imposing a curfew and extended curfew for noisy aircraft, it erred in granting a preliminary injunction against the Town's "one-trip" rule, which prohibits certain noisy aircraft from using the East Hampton Airport more than two times per week. This appeal challenges that ruling.

## STATEMENT OF JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. § 1331. The Town of East Hampton filed a timely notice of appeal from the district court's decision

on July 22, 2015. This Court has jurisdiction over this appeal under 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED

1.     While ultimately reaching the correct conclusion that Plaintiffs have no viable claim under the Airport Noise and Capacity Act of 1990 ("ANCA"), 49 U.S.C. § 47521, *et seq.*, did the district court err in determining that Plaintiffs have a private right of action to enforce ANCA in the first place?

2.     Did the district court err in determining, under an erroneous test requiring a showing that there was no less restrictive alternative, that the Town of East Hampton's law prohibiting certain aircraft from using the East Hampton Airport more than two times per week is preempted as an unreasonable exercise of the Town's proprietary rights and powers?

## STATEMENT OF THE CASE

This case arises from a complaint filed in the U.S. District Court for the Eastern District of New York on April 21, 2015, seeking to enjoin the Town of East Hampton's enforcement of three local laws aimed at curbing the deleterious effects of excessive aircraft noise at the East Hampton Airport: (1) a mandatory curfew prohibiting all aircraft from using the Airport between 11:00 p.m. and 7:00 a.m. (the "Mandatory Curfew"); (2) an extended curfew prohibiting aircraft defined to be "Noisy Aircraft" from using the Airport from 8:00 p.m. to 9:00 a.m.

(the "Extended Curfew"); and (3) a weekly limit prohibiting "Noisy Aircraft" from using the Airport more than two times per week from May to September (the "One-Trip Limit") (collectively, the "Local Laws"). Plaintiffs moved for a temporary restraining order, which the district court (Seybert, J.) treated as a motion for a preliminary injunction. SPA15.[1] The district court granted the motion as to the One-Trip Limit, and denied the motion as to the Mandatory Curfew and Extended Curfew. SPA45. The Town timely filed its notice of appeal on July 22, 2015. A511-12. Plaintiffs filed a notice of cross appeal on August 4, 2015. A513.

## A. Statutory Background

The Airline Deregulation Act ("ADA") has a provision generally preempting state or local laws related to a price, route, or service of an air carrier:

> Except as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart.

49 U.S.C. § 41713(b)(1). However, the ADA states that such preemption does *not* apply to a state or local government that owns or operates an airport when "carrying out its proprietary rights and powers":

---

[1] References to the Special Appendix are cited as "SPA__." References to the Joint Appendix are cited as "A__."

3

> This subsection does not limit a State, political subdivision of a State, or political authority of at least 2 States that owns or operates an airport served by an air carrier holding a certificate issued by the Secretary of Transportation from carrying out its proprietary powers and rights.

*Id.* § 41713(b). This language is a codification of the "proprietor exception" to preemption, which was recognized even before the ADA was enacted in 1978. *See Nat'l Helicopter Corp. v. City of New York*, 137 F.3d 81, 88-89 (2d Cir. 1998) (explaining the history of the proprietor exception).

ANCA provides for certain procedural steps for noise restrictions on Stage 2 aircraft:

> (b) Stage 2 aircraft.— Except as provided in subsection (d) of this section, an airport noise or access restriction may include a restriction on the operation of stage 2 aircraft proposed after October 1, 1990, only if the airport operator publishes the proposed restriction and prepares and makes available for public comment at least 180 days before the effective date of the proposed restriction—
>
> (1) an analysis of the anticipated or actual costs and benefits of the existing or proposed restriction;
>
> (2) a description of alternative restrictions;
>
> (3) a description of the alternative measures considered that do not involve aircraft restrictions; and
>
> (4) a comparison of the costs and benefits of the alternative measures to the costs and benefits of the proposed restriction.

49 U.S.C. § 47524(b). And ANCA provides for FAA review of noise restrictions on Stage 3 aircraft:

> (c) Stage 3 aircraft.—

4

(1) Except as provided in subsection (d) of this section, an airport noise or access restriction on the operation of stage 3 aircraft not in effect on October 1, 1990, may become effective only if the restriction has been agreed to by the airport proprietor and all aircraft operators or has been submitted to and approved by the Secretary of Transportation after an airport or aircraft operator's request for approval as provided by the program established under this section. . . .

(2) Not later than 180 days after the Secretary receives an airport or aircraft operator's request for approval of an airport noise or access restriction on the operation of a stage 3 aircraft, the Secretary shall approve or disapprove the restriction. The Secretary may approve the restriction only if the Secretary finds on the basis of substantial evidence that—

(A) the restriction is reasonable, nonarbitrary, and nondiscriminatory;

(B) the restriction does not create an unreasonable burden on interstate or foreign commerce;

(C) the restriction is not inconsistent with maintaining the safe and efficient use of the navigable airspace;

(D) the restriction does not conflict with a law or regulation of the United States;

(E) an adequate opportunity has been provided for public comment on the restriction; and

(F) the restriction does not create an unreasonable burden on the national aviation system.

Id. § 47524(c).  ANCA states that if an aircraft noise restriction complies with these provisions, then the airport is eligible for certain federal funds:

(e) Grant Limitations.— Beginning on the 91st day after the Secretary prescribes a regulation under subsection (a) of this section, a sponsor of a facility operating under an airport noise or access restriction on the operation of stage 3 aircraft that first became

5

effective after October 1, 1990, is eligible for a grant under section 47104 of this title and is eligible to impose a passenger facility charge under section 40117 of this title only if the restriction has been—

> (1) agreed to by the airport proprietor and aircraft operators;

> (2) approved by the Secretary as required by subsection (c)(1) of this section; or

> (3) rescinded.

*Id.* § 47524(e). Another provision of ANCA also makes clear that if the FAA does not find that a noise restriction meets the above requirements, the airport may not receive those federal funds:

> Unless the Secretary of Transportation is satisfied that an airport is not imposing an airport noise or access restriction not in compliance with this subchapter, the airport may not—

> > (1) receive money under subchapter I of chapter 471 of this title; or

> > (2) impose a passenger facility charge under section 40117 of this title.

*Id.* § 47526.

### B. The Town Of East Hampton And East Hampton Airport

The Town of East Hampton is the easternmost town on Long Island, approximately 100 miles east of New York City. A290 ¶ 3. The Town's year-round population is approximately 21,000, but that number almost quadruples during the summer busy season, which is roughly May through September. A291 ¶ 4. The Town is one of the most desirable resort communities in the country, with world-renowned ocean beaches, wetlands, shorelines, harbors, bays, woodlands,

6

and historic hamlets.  A292 ¶ 7.  The tranquility and natural beauty of the Town are critical to its economy and also to the quality of life of its residents.  *Id.*

The Town owns and operates the East Hampton Airport ("Airport").  A291 ¶ 5.  The Airport offers no scheduled commercial service, but serves a range of private recreational, personal, and corporate aircraft operations, as well as charter operations by fixed-wing aircraft and helicopters.  *Id.*

### C.    Early Steps To Address The Noise Problem

For over a decade, the residents of the Town have expressed concern about the noise from aviation operations at the Airport.  A292 ¶ 8.  There has been public debate over the issue, as well as lawsuits aimed, directly or indirectly, at reducing aircraft noise.  A301.

The Town has attempted to address the noise problem in several ways.  *First*, the Town has worked with airport pilots and operators to develop voluntary procedures including:  recommended helicopter and jet altitudes; recommended arrival and departure routes for helicopters; and discouragement of repetitive training operations during the busy summer season.  A302; A333 ¶ 27.  *Second*, the Town commissioned studies to analyze the problem, including:  an Environmental Assessment in 2000; a comprehensive noise measurement program instituted in 2003; an updated Airport Master Plan in 2007; a Final Generic Environmental Impact Statement in 2010; and an Environmental Assessment in 2013.  A302.

*Third*, the Town met frequently with airport stakeholders and federal officials to discuss the issue. A303.

By 2012, the Town recognized that its efforts had not resolved the noise problem and adopted a resolution to obtain better data. *Id.* In particular, the Town concluded that it needed better data to correlate specific aircraft operations to complaints and community concern. To that end, the Town added a Vector camera system, which photographs the movement of aircraft and identifies them by aircraft type, runway used, and time of operation. *Id.* In addition, to supplement its informal complaint logging system, the Town contracted with PlaneNoise Inc. to install and operate a noise complaint management service to collect better data related to aircraft noise complaints. A304. PlaneNoise is used at a broad range of airports, including the five operated by the Port Authority of New York and New Jersey. A326-27 ¶ 13. More generally, the use of noise complaints to determine the scope of an aircraft noise problem "is an industry-standard practice in all types of noise studies." A330 ¶ 19 (expert declaration of Ted Baldwin).

### D.    The Recent Escalation Of The Noise Problem

In the last few years, noise from aircraft flying to and from the Airport has increased dramatically. A292 ¶ 8. Helicopter operations (*i.e.*, landings and take-offs) grew from 5,728 in 2013 to 8,396 in 2014, a 47% increase; the growth was even more rapid during the peak season from May through September, increasing

by 54%.  A357 ¶ 8.  On the busiest day last year, there were 353 total operations

and 44 operations in a single hour.  A293 ¶ 11.

The increase in aircraft noise in 2014 sparked an enormous response from

the community and a record number of noise complaints.  A333 ¶ 28.  The Town

Board[2] received petitions signed by hundreds of residents, as well as thousands of

complaints by email, phone, testimony at Board meetings, letters to local papers,

and formal complaints through the PlaneNoise system – all demanding that the

Town address the problem.  A292-93 ¶ 9.  From the PlaneNoise system alone,

there were 23,954 complaints filed by 633 separate households.  *See*

http://ehamptonny.gov/DocumentsPDF/Airport/AirportNoiseInterim/Phase2Noise

Analysis12214.pdf (referenced at A308).

To many Town residents, the noise was more than a mild annoyance.  The

Town Board heard testimony that, for some, the aircraft noise makes it impossible

to hold a simple conversation over the dinner table, and sometimes even requires

residents to leave their homes to get relief.  A293 ¶ 12.  Indeed, one Town resident

– who did not submit any complaint about the noise – provided a declaration in this

case stating that while there was sporadic noise many years ago, recently the noise

has become "constant," with "flights over my house every ten minutes" that

---

[2]  The Town's legislative power is vested in a Town Board, which consists of five members.

9

"disrupts my ability to enjoy my house."  A384 ¶ 9.  It is also an economic concern, as real estate agents recognize that aircraft noise caused by use of the Airport is a "critical consideration" for people purchasing or renting property in East Hampton.  A381-82 ¶¶ 6-7.[3]  Helicopters are especially problematic because – unlike jet traffic, which has well known approach and departure paths – the helicopters' altitude, routes, and approaches are voluntary and variable.  A381 ¶ 5.  In short, aircraft noise threatens the tranquility and rural quiet that are the foundation for the economy and quality of life in East Hampton.  A298 ¶ 29.

### E.    The Town's Analysis And Debate

Recognizing the escalating problem, the Town engaged in a detailed analysis and extensive, public debate to identify the most significant causes of the noise and to find a solution.  A293 ¶ 13.  To begin with, the Town created a new Airport Planning Committee with two subcommittees: the Noise Subcommittee, consisting of persons interested in pursuing noise abatement measures at the Airport, and the Aviation Subcommittee, consisting of individuals in the aviation community.  A305.  The Town also began Phase I of a series of refined noise analyses, conducted by noise expert Henry Young of Young Environmental Sciences (in coordination with Les Blomberg of the Noise Pollution Clearinghouse) to quantify

---

[3]    The noise from aircraft using the Airport also has an effect on people outside the Town, such that all nearby towns have passed resolutions seeking that the noise problem be addressed.  A301 (citing resolutions from the Town of Southold, Town of Southampton, and Shelter Island).

the current noise and the reductions that could be achieved by different measures. *Id*. On August 27, 2014, the Town held a special meeting to hear concerns about aircraft noise, and on September 18, 2014, the Town announced its intent to conduct a formal, transparent process, involving data collection and analysis, as well as public meetings and opportunity for public comment, in order to identify and adopt regulations to address noise from operations at the Airport. A305-06.

In an October 30, 2014 Special Meeting, the Town Board heard a joint citizen and consultant presentation on noise from operations at the Airport, including a presentation of the Phase I noise analysis. A306; A324 ¶ 8; A340. Young Environmental Sciences reported that helicopter noise generated the majority of complaints; compliance with the 2013 voluntary helicopter procedures was low (15.3%); and complaints peaked during the summer, on weekends, and in response to nighttime operations. A306-07.

Following receipt of the Phase I analysis and review of public comments on it, the Town Board decided that more refined noise analysis was warranted and it commissioned Harris Miller Miller & Hanson Inc. ("HMMH") to conduct a more detailed ("Phase II") study. A308; A340. HMMH was hired to conduct analyses to define the noise problem and to identify potential approaches to address it. A322 ¶ 1. The HMMH team was led by Ted Baldwin, a specialist in aviation noise projects with a Master of City and Regional Planning degree from Harvard

11

University.   A323 ¶¶ 3-4.   Over his career, Mr. Baldwin has assisted over 75 airports on a diverse range of assignments related to aviation noise measurement, monitoring, and abatement.  A323 ¶ 7.

On December 2, 2014, HMMH presented the Phase II study, with a detailed breakdown of complaint data, including information about households that filed multiple complaints, as well as up-to-date operations data the Airport.   A308. HMMH agreed with the Phase I conclusions that noise from operations at the Airport disturbs many residents, that helicopters created a greater disturbance than other aircraft, and that frequent and night operations caused the greatest disturbance.  *Id.*

HMMH and the Town's aviation counsel presented a full array of potential options, ranging from a ban on specific aircraft types to measures outside the Town's control, such as flight procedures that only the FAA can impose.  A308-09.   HMMH recommended that the Town Board reject the following three alternatives:  that the Town take no action (because the problem was significant and needed to be addressed); that the Town employ noise mitigation such as sound insulation or home buy-out programs (because residents frequently keep windows open and land values are so high); and that the Town impose fee-based restrictions (because the fee would have to be very high, which might create a practical limit on who could use the Airport).  A309.  HMMH recommended further study of the

12

following alternatives: a ban on noisy aircraft, voluntary measures, and required routes or altitudes.  A309-10.

The Noise Subcommittee of the Town Board reached conclusions similar to those of the consultant team.  A310.  Ultimately, it recommended that the Board adopt a package of measures: (1) a classification of operations into noise-based categories (*i.e.*, quiet, noisy, and noisiest); (2) a 5 p.m. - 9 a.m. curfew for noisiest aircraft and 7 p.m. - 8 a.m. curfew for noisy aircraft; (3) a ban on noisiest helicopters; (4) a limitation of noisiest aircraft to two operations per week; (5) a seasonal weekend and holiday ban on noisy helicopters; (6) a seasonal weekend and holiday noise pollution surcharge for noisy aircraft; and (7) a seasonal weekend ban on touch-and-go operations.  A312.

The Aviation Subcommittee disagreed with the Noise Subcommittee in several respects.  It expressed concerns about the use of complaint-driven studies, the manner of tracking compliance with voluntary helicopter routes, and the three-tier noise ranking system for aircraft.  *Id.*

In December 2014, the Town commissioned Phase III of the noise study to analyze the various alternatives to address the noise problem.  A340.  On February 4, 2015, the Town's consultants presented findings on four proposed restrictions: (1) a nighttime curfew; (2) an extended curfew for "noisy" helicopters; (3) a weekend ban during the summer season on helicopters; and (4) a one-trip-per week

limit on "noisy" aircraft. A295 ¶ 20; A312; A340. The Phase III study included estimates of the affected operations and associated noise complaints for each proposal. A340. Specifically, the analyses were based on complaint and operations data for the twelve months from November 1, 2013 through October 30, 2014. A324-25 ¶ 9. Based on the data, the study concluded that, if the Mandatory Curfew, Extended Curfew, and One-Trip Limit had been in place during that period, "they would have *affected under 23% of total operations, while addressing the cause of over 60% of the complaints*." A325 ¶ 11 (emphasis added). Similarly, the projected effects for 2015 showed that the three restrictions would address 61.8% of complaints while affecting 26.6% of operations during the summer season. A351. The full table of projected effects is below, with restrictions 1, 2, and 5b representing the Mandatory Curfew, Extended Curfew, and One-Trip Limit, respectively:

|  | May 1 – September 30, 2015 | | | October 1, 2014 – September 30, 2015 | | |
|---|---|---|---|---|---|---|
|  | **Helicopters** | **Fixed-Wing** | **All Aircraft** | **Helicopters** | **Fixed-Wing** | **All Aircraft** |
| Estimated Number of Operations Affected | 4,728 | 552 | 5,280 | 4,887 | 652 | 5,539 |
| Total Existing Operations in Category | 5,855 | 14,004 | 19,859 | 7,044 | 18,670 | 25,714 |
| % Total Operations Affected by Restrictions 1, 2, and 5b | 80.8% | 3.9% | 26.6% | 69.4% | 3.5% | 21.5% |
| Estimated Associated Complaints | 12,230 | 704 | 12,934 | 12,425 | 740 | 13,166 |
| Total Existing Complaints in Category | 14,935 | 5,999 | 20,934 | 16,152 | 6,316 | 22,468 |
| % Total Complaints Associated with Restrictions 1, 2, and 5b | 81.9% | 11.7% | 61.8% | 76.9% | 11.7% | 58.6% |

14

*Id.* The study also analyzed a two-trip-per-week rule, finding that such a rule would address less than 50% of complaints and would still affect more than 20% of aircraft operations during the summer season. *Id.*

The Town also commissioned a study entitled "Potential Traffic Diversion from Proposed Restrictions at HTO" ("Diversion Study"). A296 ¶ 23. The study was performed by Peter Stumpp; he has a Masters in City and Regional Planning from Harvard University, specializes in aviation economics and forecasting, and has prepared noise studies at airports throughout the country. A356-57 ¶¶ 3-4. The Diversion Study assessed the ability of aircraft and helicopter operators to adapt to the three Local Laws ultimately enacted by operating with compliant aircraft, shifting schedules, and/or using alternative airports. A366-67. It concluded that a great many of the operations affected by the Local Laws would shift time or use alternative airports. *Id.* For instance, for the One-Trip Limit, the study determined that operators would adjust to the restriction by re-scheduling approximately 1,102 operations, diverting approximately 2,538-3,216 operations to another airport, and switching approximately 1,504-2,182 operations to a quieter aircraft. A376.

The Town conducted a detailed analysis of the pros and cons of each of the restrictions, considering data from the studies. A312-16. The Town also considered verbal public input made at the February 4 meeting, a subsequent

March 3 work session, and a March 12 public hearing; and written input received via mail, and via a link on the Town's website. A340. The Town further considered the formal complaints submitted through the Town's website, with a volume (almost 24,000 complaints) that the Town's expert called "extraordinary" and resounding evidence of a noise problem. A294-95 ¶¶ 15-17. The Town took into consideration that some households had submitted many complaints, but also that some households affected by noise did not submit complaints at all. A330 ¶ 20; *see also* A295 ¶ 18. To ensure that users of the Airport had every opportunity to propose alternatives, HMMH and the Town Board met with representatives of major helicopter and fixed-wing operator constituencies, as well as ground-support businesses, on January 21, 2015. A333-34 ¶ 29; *see also* A310; A319; A352.

On March 12, 2015, the Town held a hearing on all four proposed restrictions and announced that it would accept comments. A318. The legislative proposals engendered a great deal of response from residents, visitors, industry associations, and individual aircraft operators. *Id.* The Town also met with senior FAA officials, members of the New York congressional delegation, and several industry groups. A318-19.

Ultimately, the Board deferred consideration of the weekend ban on helicopters because the Board determined that, even without the ban, the other

three proposed laws would provide meaningful relief from noise, and at the present time, the ban might tip the scales too strongly against airport users. A297 ¶ 24; A319-20. In addition, the Diversion Study showed that a ban might result in problematic increases in helicopter activity at nearby airports. A319.

### F. The Local Laws

On April 16, 2015, the Town passed the Local Laws denominated as Sections 75-38 and 75-39 of the Town of East Hampton Code. *See* Town of E. Hampton Res. 2015-411, 2015-412, 2015-413. The access restrictions are as follows: (1) a mandatory curfew prohibiting all aircraft from using the Airport between 11:00 p.m. and 7:00 a.m. (the "Mandatory Curfew"); (2) an extended curfew prohibiting "Noisy Aircraft" from using the Airport from 8:00 p.m. to 9:00 a.m. (the "Extended Curfew"); and (3) a weekly limit prohibiting "Noisy Aircraft" from using the Airport (*i.e.*, taking off or landing) more than two times per week during the "Season," which is from May to September[4] (the "One-Trip Limit"). *See* Town of E. Hampton Code § 75-38(B)-(C). "Noisy Aircraft" is defined as "any airplane or rotorcraft for which there is a published Effective Perceived Noise in Decibels (EPNdb) approach (AP) level of 91.0 or greater." *Id.* § 75-38(A)(4)(a).

---

[4] The original version of the Local Laws did not include a definition for the term "Season." However, the Town adopted a definition at a Town Board meeting on May 7, 2015. *See* Town of E. Hampton Res. 2015-569.

The Board determined that while these three restrictions would not resolve all complaints, they struck a reasonable balance and would provide meaningful relief. A320. In particular, the Town relied on the data from HMMH showing that the One-Trip Limit, in conjunction with the Mandatory Curfew and Extended Curfew, will affect only 23% of all aircraft operations while addressing 60% of complaints on an annual basis. *Id.* Thus, the three proposals would provide a significant benefit to those harmed by noise while limiting the disruption of aircraft operations. *Id.* The Town would also revisit its decision after learning the effects of the Local Laws after they are in place for a season. *Id.*

## G.    Regulatory History Of The Airport

From 1983 to 2001, the Town received several federal grants for airport development under the Airport Improvement Program ("AIP"), pursuant to the Airport and Airway Improvement Act of 1982 ("AAIA"). A32 ¶ 61. The FAA has not awarded the Town an AIP grant since 2001. A32 ¶ 62. Under the AAIA, the FAA may approve a grant application only if the airport proprietor agrees to certain written assurances (*i.e.*, grant assurances) regarding airport operations, which are set forth in Section 47107(a) of the AAIA. *See* 49 U.S.C. § 47107(a). Grant Assurance 22(a) states: "[The airport sponsor] will make the airport available as an airport for public use on reasonable terms and without unjust discrimination to all types, kinds and classes of aeronautical activities, including

18

commercial aeronautical activities offering services to the public at the airport."
A61.

In 2003, the Committee to Stop Airport Expansion (the "Committee"), an unincorporated association of residents living near the Airport, commenced several legal proceedings in an attempt to halt development of the Airport. *See Comm. to Stop Airport Expansion, et al. v. Dep't of Transp., et al.*, No. 03-CV-2634 (E.D.N.Y.). In 2005, the Committee and the United States executed a settlement agreement resolving the suit, as well as other actions the Committee commenced in other forums. A401-12. Under the 2005 settlement agreement, the FAA agreed that, with respect to the Airport, Grant Assurance 22(a) "[would] not be enforced [by the FAA] beyond December 31, 2014." A407 ¶ 7.

In December 2011, then-U.S. Representative Timothy Bishop ("Bishop"), whose district included the Town of East Hampton, submitted a list of questions to the FAA concerning the legal effect of the Town's grant assurances on its ability to enact noise and access regulations at the Airport. A397-98. The FAA responded in February 2012 by stating that, in light of the 2005 settlement agreement, the FAA would not, as of December 31, 2014, "initiate or commence an administrative grant enforcement proceeding in response to a complaint from aircraft operators … or seek specific performance of Grant Assurance[] 22a" unless and until the FAA awarded a new AIP grant to the Town. A391. In addition, the FAA stated that

19

"[t]he FAA's agreement not to enforce also mean[t] that unless the town wishe[d] to remain eligible to receive future grants of Federal funding, it [was] not required to comply with [ANCA] … in proposing new airport noise and access restrictions." *Id.*[5]

## H.  Plaintiffs' Complaint

On April 21, 2015, Plaintiffs brought suit against the Town in the U.S. District Court for the Eastern District of New York.  In their Amended Complaint, Plaintiffs allege that the three Local Laws are preempted by federal law.  A47-48 ¶¶ 104-15.  Plaintiffs also allege that the Local Laws constitute an unlawful restraint on interstate commerce in violation of the Commerce Clause of the U.S. Constitution.  A48-49 ¶¶ 116-26.

## I.  The District Court's Decision

On April 29, 2015, Plaintiffs filed a motion for a temporary restraining order to enjoin enforcement of all three Local Laws.  Plaintiffs relied solely on their preemption claims, arguing that (i) the Local Laws are preempted by the AAIA because they violate certain grant assurances with which a recipient of federal funding must comply, *see* 49 U.S.C § 47107; (ii) the Local Laws are preempted by

---

[5]  In January 2015, many of Plaintiffs in this case filed a separate action against the FAA, alleging that the FAA has a statutory obligation to enforce Grant Assurance 22(a), and that the FAA's position on ANCA is erroneous.  *See Friends of the East Hampton Airport, Inc. v. FAA*, No. 9:15-CV-00441(JS)(ARL) (E.D.N.Y.).  The FAA filed an answer, but there has not yet been any substantive briefing in that case.

ANCA because the Town did not comply with ANCA's procedural requirements for adopting noise and access restrictions, *see* 49 U.S.C. § 47524(c); and (iii) the Local Laws are preempted by federal law because they are unreasonable. On May 18, 2015, the district court heard argument on the motion. A455-91.

On June 26, 2015, the district court issued an order granting in part and denying in part Plaintiffs' motion for a temporary restraining order, which the court treated as a motion for a preliminary injunction. SPA1-45. Specifically, the court granted the preliminary injunction as to the One-Trip Limit and denied the preliminary injunction as to the Mandatory Curfew and Extended Curfew.

*First*, the court ruled (SPA19-22) that the AAIA and ANCA do not create private rights of action. The court also recognized (SPA22-23) that the Supremacy Clause does not provide the basis for a private right of action. Nonetheless, the court held (SPA23-24) that Plaintiffs may be able to invoke the court's equity jurisdiction to enjoin the allegedly preempted regulations so long as the AAIA and ANCA do not prohibit such an action. As to the AAIA, the court held (SPA24) that Congress intended to foreclose private equitable enforcement. However, as to ANCA, the court held (SPA28) that Congress did not intend to preclude equitable enforcement, and that Plaintiffs could bring an equitable preemption claim based on ANCA.

21

*Second*, the court ruled (SPA28-32) that Plaintiffs would face irreparable harm absent an injunction based on the alleged harm to their businesses.

*Third*, the court ruled that Plaintiffs had a likelihood of success on the merits solely as to the One-Trip Limit. The court held (SPA34-37) that ANCA does not expressly preempt the Local Laws because ANCA does not displace the "proprietor exception." Specifically, the court noted (SPA34) that the general preemption provision in the Airline Deregulation Act, covering "laws related to a price, route, or service of an air carrier," 49 U.S.C. § 41713(b)(1), "does not limit a State, political subdivision of a State, or political authority of at least 2 States that owns or operates an airport served by an air carrier holding a certificate issued by the Secretary of Transportation from carrying out its proprietary powers and rights." 49 U.S.C. § 41713(b)(3). "Under this 'cooperative scheme,' Congress has consciously delegated to state and municipal proprietors the authority to adopt rational regulations with respect to the permissible level of noise created by aircraft using their airports in order to protect the local population." SPA34-35 (quoting *Nat'l Helicopter*, 137 F.3d at 88).

The district court recognized (SPA37) that the proprietor exception requires the Local Laws to be "'reasonable, nonarbitrary, and nondiscriminatory'" (quoting *Nat'l Helicopter*, 137 F.3d at 88). The court explained (SPA38-43) that, based on the evidence, the Mandatory Curfew and Extended Curfew satisfy this test.

However, in a single paragraph, the court held (SPA44) that the One-Trip Limit failed this test because there is supposedly "no indication that a less restrictive measure would not also satisfactorily alleviate the Airport's noise problem."

*Fourth*, the court held (*id.*) that the balance of hardships tips in the Town's favor with respect to the Mandatory Curfew and Extended Curfew. The court held (SPA44-45) that it tips in Plaintiffs' favor as to the One-Trip Limit, however, based on the supposed impact on Plaintiffs' businesses and the Town's supposed failure to show a less restrictive alternative could not alleviate the noise problem.

## SUMMARY OF ARGUMENT

This Court should reverse the district court's decision granting a preliminary injunction against the One-Trip Limit. The procedure that the Town of East Hampton employed in passing the Local Laws, including the One-Trip Limit, is a model of how laws should be enacted. The Town considered all of the evidence, the potential options, the advice of experts, and the opinions of residents and businesses. Only then did the Town conclude based on all of the available information that the One-Trip Limit, along with the curfews, was the means that most fairly balanced the interests of the people who used the Airport and the people affected by the noise problem. The district court nonetheless held that the One-Trip Limit was unreasonable because it was supposedly not the least restrictive alternative for addressing the noise problem. This holding conflicts

directly with this Court's precedents, which have applied a much more deferential standard for reasonableness in applying the proprietor exception. Indeed, this Court has upheld more restrictive regulations of noise based on much less evidence than the Town had here.

Specifically, this Court should rule as follows:

*First*, this Court should affirm the district court's conclusion that Plaintiffs have no valid claim under ANCA, but should do so on the alternative ground that Plaintiffs have no right of action to enforce ANCA at all. ANCA provides a specific, limited remedy to the FAA for violations, and it gave exclusive discretion to the FAA to determine whether ANCA is violated. These are the same considerations that led the Supreme Court to deny the existence of a private injunctive claim in *Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378 (2015). Just as in *Armstrong*, a private injunctive claim here is inconsistent with the statutory scheme giving the agency a much narrower remedy. Indeed, the FAA has stated clearly that there is no viable ANCA claim here.

*Second*, this Court should reverse the district court's holding that the One-Trip Limit is preempted by any federal requirement that a proprietor's noise regulations be reasonable, nonarbitrary, and non-discriminatory. The district court committed a legal error (SPA44) in treating reasonableness as requiring that the regulation be the least restrictive alternative for addressing the noise problem.

There is no support for such a strict test, and it conflicts with this Court's precedents, which make clear that such perfection in regulating noise is not required.

Moreover, under any formulation of the requirement of reasonableness, the One-Trip Limit was reasonable. The Town undertook an extraordinarily open and thorough process in determining how best to address the noise problem. It decided to adopt the One-Trip Limit only after considering three phases of increasingly detailed expert analyses, including data showing that the three Local Laws together would address over 60% of noise complaints while affecting under 23% of operations at the Airport. A325 ¶ 11 (expert declaration of Ted Baldwin). This careful process and data-driven analysis provide far more support for the restrictions here than the evidence used to support the restrictions this Court approved in *National Helicopter*. Indeed, the district court did not identify any alternative to the One-Trip Limit that could provide similar noise relief while restricting fewer aircraft operations. This is not surprising, since the Town spent years considering alternatives before enacting the One-Trip Limit. That decision was more than reasonable, and thus there is no basis to enjoin it.

## STANDARD OF REVIEW

"When reviewing a district court's [decision on] a preliminary injunction, we review the district court's legal holdings de novo and its ultimate decision for

25

abuse of discretion." *D.D. ex rel. V.D. v. N.Y. City Bd. of Educ.*, 465 F.3d 503, 510 (2d Cir. 2006). A district court abuses its discretion when "its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding." *Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 169 (2d Cir. 2001). The district court's determination of whether Plaintiffs have a private right of action is a legal holding reviewed de novo. *See Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 116 (2d Cir. 2007). In addition, "the district court's determination regarding preemption is a conclusion of law, and we therefore review it de novo." *Drake v. Laboratory Corp. of Am. Holdings*, 458 F.3d 48, 56 (2d Cir. 2006).

## ARGUMENT

"To obtain a preliminary injunction, the moving party must demonstrate '(1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and (3) that the public's interest weighs in favor of granting an injunction.'" *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011) (quoting *Metro. Taxicab Bd. of Trade v. City of N.Y.*, 615 F.3d 152, 156 (2d Cir. 2010)). The Town addresses only the second issue in this appeal. As to this issue, a "serious question" does not suffice here because where "'the moving party seeks a

preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard.'" *Metro. Taxicab Bd.*, 615 F.3d at 156 (quoting *Cnty. of Nassau v. Leavitt*, 524 F.3d 408, 414 (2d Cir. 2008)). Thus, as the district court recognized (SPA16-17), Plaintiffs are entitled to an injunction only if they can demonstrate a likelihood of success on their claims. As set forth below, Plaintiffs failed to do so, and therefore the district court erred in granting a preliminary injunction as to the One-Trip Limit.

## I. THE DISTRICT COURT CORRECTLY RULED THAT PLAINTIFFS HAVE NO VALID CLAIM UNDER THE AAIA OR ANCA, BUT THE ANCA RULING SHOULD BE AFFIRMED ON THE ALTERNATIVE GROUND THAT THERE IS NO PRIVATE RIGHT OF ACTION TO ENFORCE ANCA

If Plaintiffs have no right of action to bring their claims, then those claims must be dismissed. *See, e.g.*, *Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 464-65 & n.13 (1974). In particular, a private party bringing suit based on a claim that a state or local law is preempted by federal law must have some right of action in order for a federal court to adjudicate the suit. *See Armstrong*, 135 S. Ct. at 1383-87. Here, Plaintiffs have no legal basis for any private right of action to challenge the Local Laws as preempted by the AAIA or ANCA under any statute, under the Constitution, or under equity jurisdiction. The

27

district court correctly held that Plaintiffs have no right of action to enforce the AAIA, and reached the right result in concluding that Plaintiffs have no successful ANCA claim, but erred in holding that Plaintiffs have a private right of action to enforce ANCA at all. The latter ruling warrants this Court's affirmance on the alternative ground that there is no basis for a private right of action to enforce ANCA.

### A. Plaintiffs Have No Statutory Right Of Action

The district court correctly held that Plaintiffs have no private right of action under any statute. As the court explained (SPA21), "[t]hat ANCA and the AAIA do not create private rights of action is beyond dispute." Indeed, courts across the country have so held. *See, e.g.*, *McCasland v. City of Castroville*, 514 F. App'x 446, 448 (5th Cir. 2013) ("As several circuit courts have held, and as Plaintiffs appear to concede, 49 U.S.C. § 47107 and its predecessor statute do not create a private right of action for parties aggrieved by alleged discrimination."); *W. Air Lines, Inc. v. Port Auth. of N.Y. & N.J.*, 817 F.2d 222, 225 & n.4 (2d Cir. 1987) (holding that 49 U.S.C. § 2210(a), the previous codification of Section 47107(a), did not create an private right of action); *see also* SPA21-22 (citing cases). Plaintiffs did not challenge this established precedent in the district court. SPA22.

### B. Plaintiffs Have No Right Of Action Under The Supremacy Clause

The district court also correctly held (SPA22-23) that the Supremacy Clause of the U.S. Constitution (Art. VI, cl. 2) does not provide Plaintiffs any private right of action. The Supreme Court recently addressed this issue, and rejected the idea that the Supremacy Clause creates a private right of action to enforce the clause itself. *See Armstrong*, 135 S. Ct. at 1383-84. The Court explained that the Supremacy Clause merely "creates a rule of decision . . . . It instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so." *Id.* at 1383. Thus, the Supremacy Clause "is not the 'source of any federal rights,' and certainly does not create a cause of action." *Id.* (quoting *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 107 (1989)). Accordingly, just as in *Armstrong*, the Supremacy Clause is unavailing to Plaintiffs here as a source of any private right of action.

### C. Plaintiffs Have No Right Of Action Under Equity Jurisdiction

The last possible basis for a right of action is a court's equity jurisdiction to enjoin unlawful conduct, but this basis does not apply here. *Armstrong* recognized that "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity." *Id.* at 1384. But this authority is limited: "The power of federal courts of equity to enjoin unlawful executive action

29

is subject to express and implied statutory limitations. Courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law." *Id.* at 1385 (internal citation and quotation marks omitted); *see also Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 74 (1996) ("Where Congress has created a remedial scheme for the enforcement of a particular federal right, we have, in suits against federal officers, refused to supplement that scheme with one created by the judiciary."). Thus, to determine whether equitable relief is available in connection with a federal statutory scheme, courts look to "Congress's 'intent to foreclose' equitable relief." *Armstrong*, 135 S. Ct. at 1385 (quoting *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 647 (2002)).

Applying this principle, the Supreme Court held in *Armstrong* that the Medicaid Act implicitly precluded enforcement of the relevant provision on two grounds. "First, the sole remedy Congress provided for a State's failure to comply with Medicaid's requirements – for the State's 'breach' of the Spending Clause contract – is the withholding of Medicaid funds by the Secretary of Health and Human Services." *Id.* This suggested an intent to preclude a private injunctive remedy because "the 'express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.'" *Id.* (quoting *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001)). Second, "the judicially unadministrable nature of [the statute's] text" – whereby state plans must "provide for payments

30

that are 'consistent with efficiency, economy, and quality of care,' all the while 'safeguard[ing] against unnecessary utilization of ... care and services" – suggested an intent to preclude a private right of action. *Id.*

Congress likewise intended to preclude an action under the two statutes at issue here, the AAIA and ANCA. The district court correctly recognized (SPA24-27) this intent with respect to the AAIA. However, the district court erred in holding (SPA28) that "[t]here is nothing in the text or structure of ANCA indicating that Congress intended to preclude a federal court sitting in equity from entertaining Plaintiffs' preemption challenge." The same considerations discussed in *Armstrong* apply equally to ANCA, and thus establish Congress's intent to preclude a private right of action in this case. Plaintiffs' lack of a right of action to enforce ANCA provides an alternative basis for the district court's ruling that Plaintiffs do not have a likelihood of success on their ANCA claim.

*First*, just like the Medicaid Act, ANCA provides a specific, limited form of relief for the agency. In particular, if an aircraft noise restriction complies with the relevant provision of ANCA, 49 U.S.C. § 47524, then the airport "is eligible for a grant under section 47104 of this title and is eligible to impose a passenger facility charge under section 40117 of this title." 49 U.S.C. § 47524(e); *see also id.* § 47526 (stating that the only relief available for the FAA is that "the airport may not—(1) receive money under subchapter I of chapter 471 of this title; or (2)

31

impose a passenger facility charge under section 40117 of this title"). In contrast, Congress gave the FAA greater remedies, including injunctive relief, for violations of other provisions of ANCA not applicable here. *See* 49 U.S.C. § 47531 (providing for civil penalties for violations of sections 47528, 47529, 47530, or 47534); *id.* § 47533 (providing for "remedies the Secretary considers appropriate, including injunctive relief" for violations of ANCA "*[e]xcept as provided by section 47524*" (emphasis added)).

There is no plausible basis on which Congress could have intended for the FAA to have only limited, monetary remedies for violations of 49 U.S.C. § 47524, but for individuals to have the much greater remedy of enjoining the noise restrictions entirely. Simply put, Congress made it clear that if an airport wants to enact noise regulations without FAA approval, then it needs to forego certain funding. The Town made just that choice, and Plaintiffs do not have the authority to take it away. Indeed, that is precisely what the FAA stated in its correspondence to Congressman Bishop: "unless the town wishes to remain eligible to receive future grants of Federal funding, it is not required to comply with the requirements under [ANCA] in proposing new airport noise and access restrictions." A391 (citing 49 U.S.C. § 47524(e)).

*Second*, again like the Medicaid Act, ANCA imposes a standard that should not be administered by the courts. Under ANCA, "an airport noise or access

restriction on the operation of stage 3 aircraft" must be approved by the Secretary of Transportation or agreed upon by all aircraft operators. 49 U.S.C. § 47524(c)(1). The Secretary then considers various factors and must make findings on substantial evidence in deciding whether to approve the restriction. *Id.* § 47524(c)(2). Thus, the approval is based on the discretionary decision of the FAA as a condition for certain funding. Congress has therefore clearly indicated that the FAA, not private individuals, should be the one to enforce ANCA's requirements. The district court failed to address any of this statutory language indicating that Congress did not intend the existence of a private right of action under ANCA. This error in the reasoning underlying the district court's correct result should be corrected through affirmance on this alternative ground.

### D. Plaintiffs Have No Valid Claim Under ANCA

Even if a private right of action exists under ANCA (it does not), the district court correctly held (SPA34) that it would provide no remedy to Plaintiffs here because it does not preempt proprietors from adopting restrictions before complying with ANCA's procedural requirements. The district court recognized (*id.*) that under the statutory scheme, the preemptive scope of the federal aviation laws does not extend to towns "carrying out [their] proprietary powers and rights." 49 U.S.C. § 41713(b)(3). And there is nothing in ANCA to suggest that Congress

intended to displace this grant of authority to proprietors. SPA35. To the contrary, as the district court explained (SPA36):

> If Congress intended to preempt all airport proprietors from enacting noise regulations without first complying with ANCA, why would it also include an enforcement provision mandating the loss of eligibility for federal funding and the ability to impose passenger facility charges? The logical answer is that Congress intended to use grant and passenger facility charge restrictions to encourage, but not require, compliance with ANCA.

The district court correctly recognized (SPA37) that Plaintiffs' ANCA claim would also be inconsistent with *National Helicopter*, where this Court "uph[e]ld various noise regulations imposed by the City of New York on Manhattan's East 34th Street Heliport notwithstanding the fact that the plaintiff in that case presented the same ANCA-preemption argument that Plaintiffs assert here." (citing *Nat'l Helicopter*, 137 F.3d at 88).

For all these reasons, the district court's decision that there was no likelihood of success on the AAIA or ANCA preemption grounds should be affirmed. There remains the question whether the district court correctly decided that Plaintiffs were likely to succeed in part on the merits of a separate preemption challenge based on the supposed unreasonableness of the One-Trip Limit. For the reasons that follow, it did not.

## II. THE DISTRICT COURT ERRED IN GRANTING A PRELIMINARY INJUNCTION AGAINST THE ONE-TRIP LIMIT BECAUSE THAT LIMIT IS REASONABLE AND THUS NOT PREEMPTED

Because Plaintiffs have no right of action to enforce ANCA or the AAIA, their only remaining claim is that the Local Laws are preempted because they are so unreasonable that they exceed the scope of the Town's authority as an airport proprietor. In granting Plaintiffs partial preliminary injunctive relief, the district court held that Plaintiffs were likely to succeed on their preemption claim insofar as the Town's One-Trip Limit was not within the exception for proprietary airports like the Town's. That ruling was in error and warrants reversal.

This Court has held that there is a proprietor exception to preemption because "Congress provided for the promulgation by airport proprietors of reasonable regulations to establish acceptable noise levels for the airfield and its environs." *British Airways Bd. v. Port Authority of N.Y.*, 558 F.2d 75, 78 (2d Cir. 1977). The limitation on this authority of airport proprietors is that they are "vested only with the power to promulgate reasonable, nonarbitrary and non-discriminatory regulations." *Id.* at 84. The "reasonable, nonarbitrary and non-discriminatory" requirement (hereinafter "reasonableness test") exists because "[a]ny other conduct by an airport proprietor would frustrate the statutory scheme and unconstitutionally burden the commerce Congress sought to foster." *Id.* In 1978, the year after *British Airways* was decided, Congress enacted the ADA, Pub.

35

L. 95-504, 92 Stat. 1708, which states that federal law does not preempt airport operators from "carrying out [their] proprietary powers and rights."  49 U.S.C. § 41713(b)(3).  This Court now treats the reasonableness test as an interpretation of this ADA language codifying the proprietor exception, as well as the statutory scheme as a whole.  *See Nat'l Helicopter*, 137 F.3d at 88.

The district court correctly held (SPA38-43) that the Mandatory Curfew and Extended Curfew are "reasonable, nonarbitrary and non-discriminatory" within the meaning of that exception from preemption.  *See also Nat'l Helicopter*, 137 F.3d at 89 ("We agree with the district court that the weekday and weekend curfews imposed should be upheld.  The protection of the local residential community from undesirable heliport noise during sleeping hours is primarily a matter of local concern and for that reason falls within the proprietor exception.").  The district court erred, however, both on the law and the facts, in striking down the One-Trip Limit as preempted by federal law.

A.     **The District Court Erred In Applying A "Least-Restrictive-Alternative" Test To Decide The Reasonableness Of The One-Trip Limit**

The district court erred as a matter of law in holding that a regulation is "reasonable" only if it is the least restrictive alternative for addressing noise.[6]

---

[6]     The district court did not find the One-Trip Limit arbitrary or discriminatory, so the Town discusses only the reasonableness requirement in this appeal.

Specifically, the court based its preliminary injunction on the idea that "there is no indication that a less restrictive measure would not also satisfactorily alleviate the Airport's noise problem." SPA44. However, this test – seemingly akin to the strict scrutiny test that is the highest bar courts set for legislative action – conflicts with the usual meaning of "reasonable," which does not require the most perfect solution to a particular problem. *Cf. Bernal v. Fainter*, 467 U.S. 216, 219-20 & n.6 (1984) ("In order to withstand strict scrutiny, the law must advance a compelling state interest by the least restrictive means available. Only rarely are statutes sustained in the face of strict scrutiny. As one commentator observed, strict-scrutiny review is 'strict' in theory but usually 'fatal' in fact.").

It also conflicts with the statutory basis for the reasonableness test as determining the scope of preemption. Regardless of whether the reasonableness test is seen as ensuring the federal scheme is not frustrated, *see British Airways*, 558 F.2d at 84, or as an interpretation of "proprietary rights and powers," *see Nat'l Helicopter*, 137 F.3d at 88, a least-restrictive-alternative standard is legally erroneous. There is no basis to presume that an otherwise reasonable regulation will undermine federal aviation law simply because it is not the least restrictive regulation of noise. And there is no basis to hold that "proprietary powers and rights" include only the power to pass the least restrictive regulation possible.

Furthermore, this Court's application of the reasonableness test in *National Helicopter* establishes that a noise restriction need not be the least restrictive alternative, and that an airport proprietor instead should be afforded great deference in determining how to address aircraft noise. *National Helicopter* concerned a number of aircraft-noise-related restrictions enacted by the City of New York for the 34th Street Heliport. In particular, the district court had held unconstitutional as preempted a law requiring a 47% reduction in operations at the Heliport. *Nat'l Helicopter Corp. v. City of New York*, 952 F. Supp. 1011, 1029-30 (S.D.N.Y. 1997). It found: "[T]here is no evidence in the record that the 47% reduction … is in any way calibrated to achieve any particular noise based result. Indeed, the [Environmental Impact Statement] does not evaluate the relative noise levels that could be expected to result from a lesser percentage reduction in operations." *Id.* at 1029. It held that "the near halving of operations at the facility is an especially severe restriction, originally settled upon for seemingly arbitrary reasons, and now defended on an incomplete and imperfect record." *Id.* at 1030.

Despite these problems with the 47% rule, this Court reversed and upheld the rule against a preemption claim. This Court recognized that the reasoning behind the 47% rule was related to a weekday flight restriction, rather than the weekend restriction actually enacted. 137 F.3d at 90. Nonetheless, the Court held that the rule was a reasonable exercise of the city's rights and thus not preempted:

38

> While we agree that the mandated 47 percent reduction in operations was not backed by any study reflecting the appropriate scenario or demonstrating that such specific percentage of noise reduction was the ideal, we also believe that the proprietor was entitled to eliminate a portion of the Heliport's operations upon reaching a conclusion that a problem of excessive noise existed. Based on the EIS's conclusion that a 47 percent reduction in operations would result in a substantial noise reduction at the Heliport, we believe that, in this case, the relevant condition was reasonable.

*Id.* The only restrictions that this Court held unlawful were those that had no relationship to noise levels or conflicted with powers expressly given to the FAA. *Id.* at 91-92.[7]

Thus, this Court applied a much more deferential interpretation of reasonableness than the least-restrictive-alternative test applied by the district court here. Once the city "reach[ed] a conclusion that a problem of excessive noise existed," then it could impose a restriction that "would result in a substantial noise reduction," even if the "specific percentage of noise reduction was [not] the ideal." *Id.* at 90. More generally, this Court recognized that, when there is a noise problem, the proprietor must have flexibility in determining how to address that problem: "it may be pursuant to a curfew, a per hour limit, or a curtailment of

---

[7]  Specifically, those restrictions were: a prohibition on certain size helicopters (regardless of their noise levels), which constituted "unreasoned discrimination"; a restriction on certain routes because "the law controlling flight paths through navigable airspace is completely preempted"; and a requirement that helicopters be marked for identification from the ground because it "interferes with the Federal Aviation Administration's duty to 'prescribe air traffic regulations ... for ... identifying aircraft.'" *Nat'l Helicopter*, 137 F.3d at 91-92 (quoting 49 U.S.C. § 40103(b)(2)).

operations, and so long as the mandated reduction is nonarbitrary and sufficiently reasonable a court may uphold the City's power to enforce such restriction." *Id.* at 91. Indeed, this Court upheld an even stricter regulation – a phase-out of all weekend operations – because it was "based on the City's desire to protect area residents from significant noise intrusion during the weekend when most people are trying to rest and relax at home," which is "*ample justification* for the application of the proprietor exception." *Id.* (emphasis added).

Similarly, this Court upheld against a preemption challenge a total ban on commercial air tour flights by sea planes where the restriction was a "*reasonable* means of achieving noise reduction," not necessarily the least restrictive means of doing so. *SeaAir NY, Inc. v. City of New York*, 250 F.3d 183, 187 (2d Cir. 2001) (emphasis added). Other courts follow the same deferential approach in evaluating the reasonableness of noise restrictions enacted by airport proprietors. *See, e.g.*, *Santa Monica Airport Ass'n v. City of Santa Monica*, 659 F.2d 100, 104-05 (9th Cir. 1981) ("The reasonable inference, not contradicted by the legislative history, is that Congress intended to allow a municipality flexibility in fashioning its noise regulations."); *Nat'l Bus. Aviation v. Naples Airport*, 162 F. Supp. 2d 1343, 1353 (M.D. Fla. 2001) (upholding ban on certain jet aircraft because "the fact that some noisier aircraft use (or may use) the airport or that other anti-noise measures have

been taken in the past do nothing to establish that *this* particular anti-noise measure is unreasonable or discriminatory").

For all these reasons, this Court should reverse the district court's legal ruling as to the applicable standard and make clear that the Town of East Hampton is likely to prevail on the merits under the appropriately deferential standard.

**B.    The District Court Erred In Holding The One-Trip Limit Unreasonable**

Under the properly deferential approach to reasonableness that this Court has consistently followed, the One-Trip Limit is more than reasonable and is therefore not preempted by federal law.    Accordingly, the grant of partial injunctive relief should be reversed for failure to show likelihood of success on the merits.[8]

**1.    The Process, Data, And Analysis Underlying The Adoption Of The One-Trip Rule Establish Its Reasonableness**

As discussed in detail above, the Town employed an extraordinarily thorough and diligent process to determine the scope of the noise problem and the best means to address it.    The Town has considered the noise problem for over a decade and has tried voluntary measures.    *See* A292 ¶ 8; A301-03; A333 ¶ 27.    The

---

[8]    This is so whether this Court reviews the reasonableness ruling *de novo* (if viewed as a legal ruling on preemption) or under the clear-error standard (if viewed as a factual finding).    *See supra* at 25-26.

41

number of helicopter operations then increased by almost 50% from 2013 to 2014, A357 ¶ 8, with an attendant rise in complaints about aircraft noise, A333 ¶ 28.

From 2014 to 2015, the Town conducted numerous public meetings, taking into account the positions of community members, industry representatives, and federal officials. *See supra* at 10-16. The Town hired two different expert consulting groups to conduct three phases of increasingly detailed studies. *Id.* Those studies analyzed the data, and performed a breakdown of the benefits and detriments of different potential regulations. *Id.* at 11-15. The Town then rejected a ban on helicopters during the summer season, opting instead for the less restrictive measures enacted in the three Local Laws. *Id.* at 16-17.

It is difficult to imagine a more open and fair evaluation of the issue than the one conducted by the Town. As the Town's expert Mr. Baldwin attested, based on his experience assisting over 75 airports, the Town's approach was "meticulous," and it "made unusually extensive efforts to ensure that its approach was open, transparent, and well-documented." A335-36 ¶¶ 35-37. The Town's process was, quite clearly, far more thorough than the analysis approved in *National Helicopter*, where the entire foundation for the 47% rule was a weekday restriction rather than the weekend restriction actually adopted. 137 F.3d at 90 ("the mandated 47 percent reduction in operations was not backed by any study reflecting the appropriate scenario").

The Town found that the noise problem was very significant, as evidenced by over 23,000 formal complaints, thousands of informal complaints, resolutions passed by nearby towns, and statements made by Town residents at public meetings. *See supra* at 9-10, 15-16. The district court agreed (SPA41) with this finding by the Town: "In adopting the Town Laws, the Town considered formal complaints submitted through the Airport's formal complaint log, which yielded over 23,000 complaints. The Court recognizes that a large portion of these complaints came from a small number of households, but it cannot be argued that the Town lacked data to support a finding of a noise problem at the Airport, particularly given the large increase in helicopter traffic in recent years." While Plaintiffs have questioned the use of complaint data, the district court correctly held (SPA41) it appropriate because "courts have affirmed the FAA's use of complaint data 'as empirical data of a noise problem.'" (quoting *Helicopter Ass'n Int'l, Inc. v. F.A.A.*, 722 F.3d 430, 436 (D.C. Cir. 2013)).[9]

---

[9] The court also recognized (SPA42) the reasonableness of the Town's definition of noisy aircraft, finding that "[t]he 91 EPNdb threshold appears to be a valid indicator of noise as it affects individuals." Thus, "the Noisy Aircraft definition is based on noise, as opposed to restrictions based on weight or size, which courts have found to constitute unreasoned discrimination because they do not regulate based on noise." SPA43. Indeed, the use of EPNdB levels is consistent with the approach of the FAA and its international noise-certification equivalent, the International Civil Aviation Organization (ICAO), which both use EPNdB to regulate allowable noise levels for the aircraft types operating at the Airport that are of primary concern; *i.e.*, jets, larger propeller-driven aircraft, and

Furthermore, the benefits and burdens of the One-Trip Limit established the reasonableness of the restriction. Specifically, the studies estimated that the Local Laws would affect "under 23% of total operations, while addressing the cause of over 60% of the complaints." A325 ¶ 11 (expert declaration of Ted Baldwin). Thus, the Local Laws provide a very significant gain to the community with a correspondingly small impact on aircraft operations. Once again, this evidence is far stronger than what was accepted in *National Helicopter*, where "there was **no evidence** that [the 47% rule] was 'in **any way** calibrated to achieve any particular noise based result.'" 137 F.3d at 90 (emphases added).

### 2. The District Court Failed To Provide Any Persuasive Basis For Questioning The Reasonableness Of The One-Trip Limit

The district court did not dispute the facts set forth above, and in upholding the Mandatory Curfew and the Extended Curfew, the court correctly rejected (SPA41-43) Plaintiffs' arguments that the complaint data is insufficient and that the definition of Noisy Aircraft is improper. Nonetheless, the court stated (SPA44), in a single paragraph, that the One-Trip Limit is unreasonable because the complaints "originated from a small percentage of the Town's residents" and because of the "drastic … effect it poses on some of Plaintiffs' businesses." In

---

heavier helicopters. A331 ¶ 25; A337 ¶ 43; *see also* A348 (noting HMMH's recommendation to use the EPNdB approach).

addition to the court's error in using a least-restrictive-alternative test, it erred in setting forth this sparse reasoning, for several reasons:

*First*, the balancing of the harm to businesses and the benefit to residents affected by noise is a quintessentially legislative task. It should not be decided by courts under the rubric of reasonableness, and Congress has never suggested that a proprietor's balancing of interests falls within the scope of preemption. This Court's precedents make clear that the authority belongs to the airport proprietor to balance the interests at stake in regulating aircraft noise. "Congress has reserved to proprietors the authority to enact reasonable noise regulations, as an exercise of ownership rights in the airport, because they are in a better position to assure the public weal." *British Airways*, 558 F.2d at 85. And in determining the "public weal," the proprietor can and must "weigh[] the commercial benefits of proposed service against its costs, both economic and political." *Id.* at 83; *see also Nat'l Helicopter*, 137 F.3d at 83 ("[T]he inherently local aspect of noise control can be most effectively left to the operator, as the unitary local authority who controls airport access."); *Global Int'l Airways v. Port Auth. of N.Y & N.J.*, 727 F.2d 246, 248 (2d Cir. 1984) ("[S]tates and localities retain power in their capacity as airport proprietors to establish requirements as to the level of permissible noise created by aircraft using their airports."). Accordingly, this Court has never questioned precisely how the proprietors weighed the interests; rather, once the noise was

established as a problem, the proprietor could address the problem in any reasonable way. *See, e.g.*, *SeaAir*, 250 F.3d at 187 (a "noise-related regulation of sightseeing flights from the seaplane base would fall comfortably within the proprietor exception" where "the City's decisions to reduce the number of flights at the seaplane base and to prioritize transportation over tourism were a reasonable means of achieving noise reduction"); *Nat'l Helicopter*, 137 F.3d at 90-91 (upholding 47% rule and phase-out of all weekend operations without any weighing of benefits and costs).

*Second*, even if the court could second-guess the proprietor's balancing of interests, that balance here was plainly reasonable. The district court ignores the fact that the Local Laws would achieve a 60% noise reduction while affecting only 23% of aircraft operations. A325 ¶ 11. Once again, this goes far beyond what *National Helicopter* demands: "It is unrealistic to insist that a proprietor justify by some scientific method a specific percentage reduction in operations in order to achieve the general result of a reduction of excessive noise." 137 F.3d at 91. Indeed, the reasonableness requirement must be applied in light of the underlying basis for that requirement, and the district court does not identify any way in which the One-Trip Limit interferes with the federal scheme or exceeds "proprietary rights and powers."

The district court seems to rely (SPA44) on the fact that the One-Trip Limit would have a substantial effect on some of Plaintiffs' particular businesses. However, that cannot be the correct analysis, as any regulation will fall more harshly on some businesses than others. And the reason that it has a significant effect on some Plaintiffs is that they fly helicopters. To be sure, the Local Laws affect helicopters more than fixed-wing aircraft, but that is a function of the fact – demonstrated repeatedly by the consultants who examined the issue carefully – that helicopters caused the greatest noise problem. *See, e.g.*, A346 (expert declaration of Ted Baldwin). Thus, the effect on Plaintiffs' businesses cannot be a legitimate basis for denying the Town's ability to address the most serious aspect of the noise problem, as shown by the cases upholding total bans with much more severe effects on businesses. *See, e.g.*, *SeaAir NY*, 250 F.3d at 187-88 (upholding total ban on commercial air tour flights by sea planes); *Nat'l Bus. Aviation*, 162 F. Supp. 2d at 1352-54 (upholding ban on certain jet aircraft). Indeed, the district court's approach collapses the inquiry as to the likelihood of success on the merits into the inquiry as to the existence of irreparable harm, such that any irreparable harm demonstrates the merits of the claim. But there is no legal basis for such an approach.

*Third*, the district court's assertion of the supposed severity of the restriction ignores the fact that the Local Laws would reduce helicopter operations only to the

level they were at in 2013 (and the Town reasonably could have gone much farther given that the 2013 level of operations still generated a significant number of noise complaints). *See* A358 ¶ 9 (expert declaration of Peter Stumpp); *see also* A307-08. The idea that helicopter operators are entitled to the enormous jump in operations in 2014, regardless of the effect on the community as a whole, is untenable. At a minimum, it was reasonable for the Town to so find.

*Fourth*, the idea that the complaints should be discounted because they came from a small percentage of households is unsupported and erroneous. There were 23,954 complaints filed by 633 separate households. *See* http://ehamptonny.gov/ DocumentsPDF/Airport/AirportNoiseInterim/Phase2NoiseAnalysis12214.pdf (referenced at A308). That many hundreds of people in a small community took the time to file formal complaints, and that some felt so strongly about the issue that they filed such complaints day after day, evidences a serious problem. These numbers do not even count the thousands of informal complaints communicated to the Town Board. *See* A324-25 ¶ 9. Nor does it count the numerous households harmed by noise but not inclined to complain. *See, e.g.*, A330 ¶ 20 (Mr. Baldwin: "In my professional experience, noise complaints reflect concerns and reactions of larger numbers of stakeholders with similar exposure to aircraft operations and noise, and actions taken to address complaints will address the concerns those larger numbers of individuals."). Mr. Baldwin, hired by the Town based on his

decades of experience, determined that the number and intensity of complaints here was extraordinary and indicative of a serious noise problem. *See, e.g.*, A294-95 ¶ 17. The Town was entitled to rely on that determination, as well as its officials' own experience in hearing from the community. *See* A292-95 ¶¶ 8-19.

*Finally*, the Town explored numerous alternatives in great detail. *See supra* at 7-8, 12-16. As Mr. Baldwin explained, "[t]he Town turned to consideration of use restrictions only after spending more than a decade conducting an exhaustive effort to identify and implement non-restrictive options." A336 ¶ 38. In particular, the Town looked at voluntary measures, noise mitigation, fee-based restrictions, required routes and altitudes, a three-tier noise ranking system for aircraft, a restriction of two trips per week, and a total ban on helicopters. A341-44; A351. The Town could find no restrictions (outside of a total helicopter ban) that would provide the kind of meaningful noise relief that the three Local Laws provide. And the district court failed to identify *any* alternative that could provide noise relief at a lesser cost to those who wish to have more flights.

For all these reasons, the finding that the One-Trip Limit is likely to be invalidated as unreasonable and thus preempted is erroneous and requires this Court's reversal.

# CONCLUSION

The district court's decision granting a preliminary injunction as to the One-Trip Limit should be reversed.


Dated: New York, New York
       November 4, 2015

                                Respectfully submitted,

                                /s/ Kathleen M. Sullivan

W. Eric Pilsk                           Kathleen M. Sullivan
KAPLAN KIRSCH & ROCKWELL LLP    David M. Cooper
1001 Connecticut Ave., Suite 800     QUINN EMANUEL URQUHART
Washington, DC 20036                & SULLIVAN, LLP
Tel: (202) 955-5600              51 Madison Avenue, 22nd Floor
Fax: (202) 955-5616             New York, New York 10010
                                Tel: (212) 849-7000
                                Fax: (212) 849-7100

*Attorneys for Appellant-Cross Appellee Town of East Hampton*

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure ("FRAP") because this brief contains 11,687 words, excluding the parts of the brief exempt by FRAP 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14-point Times New Roman font.

/s/ Kathleen M. Sullivan_____

**SPECIAL APPENDIX**

# TABLE OF CONTENTS

**Page**

Memorandum and Order, dated June 26, 2015,
  Appealed From  ....................................................  SPA-1

SPA-1

```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
FRIENDS OF THE EAST HAMPTON
AIRPORT, INC.; ANALAR CORPORATION;
ASSOCIATED AIRCRAFT GROUP, INC.;
ELEVENTH STREET AVIATION, LLC;
HELICOPTER ASSOCIATION
INTERNATIONAL, INC.; HELIFLITE
SHARES, LLC; LIBERTY HELICOPTERS,
INC.; SOUND AIRCRAFT SERVICES,
INC.; and NATIONAL BUSINESS                MEMORANDUM & ORDER
AVIATION ASSOCIATION, INC.,                15-CV-2246(JS)(ARL)

                    Plaintiffs,

          -against-

THE TOWN OF EAST HAMPTON,

                    Defendant.
--------------------------------X
APPEARANCES
For Plaintiffs:      Matthew Gage Coogan, Esq.
                     Jonathan Daniel Lamberti, Esq.
                     Michael Dayton Longyear, Esq.
                     Lisa R. Zornberg, Esq.
                     Lankler Siffert & Wohl LLP
                     500 Fifth Avenue, 34th Floor
                     New York, NY 10110

For Defendant:       Peter Kirsch, Esq.
                     William E. Pilsk, Esq.
                     Kaplan Kirsch & Rockwell
                     1675 Broadway, Suite 2300
                     Denver, CO 80202

                     Eric Bregman, Esq.
                     Farrell Fritz PC
                     50 Station Road
                     Water Mill, NY 11976
```

SEYBERT, District Judge:

Plaintiffs, a group of airport users and aviation companies that frequently use the East Hampton Airport, bring this

action against the Town of East Hampton, seeking declaratory and injunctive relief enjoining enforcement of Sections 75-38 and 75-39 of the Town of East Hampton Code, recently adopted town laws that impose access restrictions to the East Hampton Airport (the "Town Laws"). Plaintiffs argue that the Town Laws are invalid because: (1) they are preempted by federal statutes governing aviation and therefore violate the Supremacy Clause of the United States Constitution, U.S. CONST. art. VI, cl. 2; and (2) they constitute an unlawful restraint on interstate commerce in violation of the Commerce Clause of the United States Constitution, U.S. CONST. art. I, § 8, cl. 3.

Presently before the Court are: (1) Plaintiffs' motion for a preliminary injunction enjoining enforcement of the Town Laws pending resolution of this action and a related action against the Federal Aviation Administration ("FAA"), Friends of the East Hampton Airport, Inc., et al. v. F.A.A., et al., No. 15-CV-0441 (E.D.N.Y.) (the "FAA Action"), (Docket Entry 19); and (2) Plaintiffs' letter motion to consolidate this action and the FAA Action for all purposes pursuant to Federal Rule of Civil Procedure 42, (Docket Entry 14). For the following reasons, Plaintiffs' motion for a preliminary injunction is GRANTED IN PART and DENIED IN PART, and the Court RESERVES JUDGMENT on Plaintiffs' motion to consolidate pending the filing of the FAA's response to the Complaint in the FAA Action.

SPA-3

BACKGROUND[1]

I.    The Parties

        Plaintiffs represent a wide spectrum of airport users and aviation companies that frequently use the East Hampton Airport (the "Airport").  Plaintiff Friends of the East Hampton Airport, Inc. ("FOEHA") is a nonprofit corporation that "represents the interests of those who seek to keep the Airport open to all types, kinds, and classes of aircraft activities and flying services." (Compl. ¶ 12.)   Plaintiffs Analar Corporation ("Analar"), Associated Aircraft Group, Inc. ("AAG"), HeliFlite Shares LLC ("HeliFlite"), and Liberty Helicopters, Inc. ("Liberty") are air carriers that are federally authorized to provide helicopter charter services to clients throughout the East Coast.  (Compl. ¶¶ 13-14, 17-18.)  In addition to providing charter services, AAG and HeliFlite manage "fractional aircraft ownership program[s]," which involve selling partial ownership or leasehold interests of a helicopter to private individuals who wish to operate their own helicopter using AAG and HeliFlite as managers.  (Compl. ¶¶ 14, 17.)  Plaintiff Eleventh Street Aviation LLC ("Eleventh Street") is an air carrier that is federally authorized to operate aircraft

_____

[1] The following facts are drawn from the Complaint in this action and the parties' affidavits and evidence submitted in connection with Plaintiffs' motion for a preliminary injunction.  Any factual disputes will be noted.

for private use.  (Compl. ¶ 15.)  Plaintiff Helicopter Association International, Inc. ("HAI") is a Delaware "trade association that represents and serves the interests of helicopter operators around the world."  (Compl. ¶ 16.)  According to the Complaint, HAI's "members include one or more providers of helicopter services" at the Airport.  (Compl. ¶ 16.)  Plaintiff Sound Aircraft Services, Inc. ("Sound") is a fixed-base operator at the Airport.  (Compl. ¶ 19.)  Sound leases property at the Airport from the Town of East Hampton and provides fuel and other on-site services to aircraft and passengers that use the Airport.  (Compl. ¶ 19.)

Defendant the Town of East Hampton (the "Town") is the easternmost town on Long Island, New York, situated approximately 100 miles east of New York City.  It is a popular seaside resort community during the summer.  The Town owns and operates the Airport, a public-use airport located in the Town.

II.  The Town Laws

For years, Town residents have opposed development of the Airport and have complained about aircraft noise.  (See Cantwell Decl., Docket Entry 38-1, ¶¶ 8-10.)  In recent years, the complaints have escalated due to a marked increase in helicopter operations at the Airport, many of which are private charter flights taken by individuals traveling from New York City to the

4

SPA-5

East End of Long Island.[2]   (See Cantwell Decl. ¶ 11; MacNiven Decl., Docket Entry 38-4; Saltoun Decl., Docket Entry 38-5.)   To alleviate this perceived noise problem, on April 16, 2015, the Town adopted Sections 75-38 and 75-39 of the Town of East Hampton Code, local laws imposing three access restrictions to the Airport. See Town of E. Hampton Res. 2015-411, 2015-412, 2015-413, to be codified at TOWN OF E. HAMPTON CODE §§ 75-38, 75-39.[3]   The access restrictions are as follows: (1) a mandatory curfew prohibiting all aircraft from using the Airport between 11:00 p.m. and 7:00 a.m. (the "Mandatory Curfew"); (2) an extended curfew prohibiting "Noisy Aircraft" from using the Airport from 8:00 p.m. to 9:00 a.m. (the "Extended Curfew"); and (3) a weekly limit prohibiting "Noisy Aircraft" from using the Airport[4] more than two times per week during the "Season"--i.e., the months of May, June, July,

---

[2] According to the Town, helicopter traffic increased by fifty percent last year.  (See Cantwell Decl. ¶ 11.)  On the busiest day last year, July 25, 2014, there were 353 operations at the Airport.  (See Cantwell Decl. ¶ 11.)  Forty-four operations occurred between 2:00 p.m. and 3:00 p.m. that day.  (See Cantwell Decl. ¶ 11.)  The first operation occurred at 3:04 a.m.; the last operation occurred at 11:08 p.m.  (See Cantwell Decl. ¶ 11.)

[3] The full text of the Resolutions adopting the Town Laws may be found at http://easthamptontown.iqm2.com/citizens/Default.aspx.

[4] The Town Laws define "Use of the Airport" in relevant part as "either one arrival (landing) at, or one departure (takeoff) from, the Airport."  TOWN OF E. HAMPTON CODE § 75-38(A)(6).

5

SPA-6

August, and September[5] (the "One-Trip Limit"). <u>See</u> TOWN OF E. HAMPTON CODE § 75-38(B)-(C). "Noisy Aircraft" is defined as "any airplane or rotorcraft for which there is a published Effective Perceived Noise in Decibels (EPNdb) approach (AP) level of 91.0 or greater." TOWN OF E. HAMPTON CODE § 75-38(A)(4)(a).

Violations of the Town Laws are deemed criminal offenses punishable by a sliding scale of monetary fines for the first three violations--$1,000; $4,000; and $10,000, respectively--and prohibition from the Airport for a period of up to two years for a fourth violation. <u>See</u> TOWN OF E. HAMPTON CODE § 75-39(B). Under the Town Laws, the Town may also seek court injunctions, restraining orders, and monetary fines against any person or entity with an ownership interest in a violating aircraft. <u>See</u> TOWN OF E. HAMPTON CODE § 75-39(E).

Plaintiffs seek a preliminary injunction enjoining enforcement of the Town Laws on the ground that they violate, and are therefore preempted by: (1) the Airport and Airway Improvement Act of 1982 ("AAIA"), 49 U.S.C. § 47101, <u>et</u> <u>seq.</u>, which governs the process through which airport proprietors can obtain federal funding for the planning and development of public-use airports;

---

[5] The original version of the Town Laws did not include a definition for the term "Season." However, the Town Board later adopted a definition at a Town Board meeting on May 7, 2015. <u>See</u> Town of E. Hampton Res. 2015-569.

SPA-7

and (2) the Airport Noise and Capacity Act of 1990 ("ANCA"), 49 U.S.C. § 47521, et seq., which governs the manner in which individual airports may adopt noise and access restrictions on certain types of aircraft.  Some of the Plaintiffs claim that they will be irreparably harmed by the Town Laws because compliance will cause incalculable damages and severe economic losses that "threaten[s] [their] continued existence."  (Pls.' Br., Docket Entry 32, at 8.)  The Town responds, inter alia, that neither federal statute preempts the Town Laws and that the adoption and enforcement of the Town Laws constitutes a valid exercise of its proprietary rights in the Airport.

III. Relevant Airport History

       The last twenty-four years of the Airport's history are marked by several key events, disputes, and agreements.  From 1983 to 2001, the Town received several federal grants for airport development under the Airport Improvement Program ("AIP"). (Compl. ¶ 60.)  The AIP, which was authorized by Congress when it enacted the AAIA, is the nation's current federal grant program for airport development.  Under the AIP, the Secretary of Transportation, through the Federal Aviation Administration ("FAA"), provides monetary grants to public agencies and airport proprietors for the planning and development of public-use airports.

7

SPA-8

Under the AAIA, the Secretary may approve a grant application only if the airport proprietor agrees to certain written assurances regarding airport operations, which are set forth in Section 47107(a) of the AAIA.  See 49 U.S.C. § 47107(a). The Secretary is responsible for ensuring compliance with these assurances, see 49 U.S.C. § 47107(g), and is authorized to approve grant applications only if the airport proprietor's assurances are "satisfactory to the Secretary," 49 U.S.C. § 47107(a). Accordingly, the Secretary, through the FAA, has promulgated a more thorough set of standardized grant assurances with which a recipient of AIP funding must comply (the "Grant Assurances"). (See Compl. Ex. A.)

"Upon acceptance of an AIP grant, the grant assurances become a binding contractual obligation between the airport sponsor and the Federal government." Pac. Coast Flyers, Inc. v. Cnty. of San Diego, FAA Docket No. 16-04-08, 2005 WL 1900515, at *11 (July 25, 2005).  Under the terms of the Grant Assurances, each Grant Assurance remains in full effect for twenty years from the date the airport proprietor accepts federal funds, with the exception of Grant Assurances 23 and 25, which remain in effect as long as the airport operates as an airport. (Compl. Ex. A at 36[6].)

---

[6] Page numbers of the exhibits to the Complaint in this action referenced herein refer to the page numbers generated by the Electronic Case Filing system.

8

SPA-9

The Town last accepted an AIP grant in 2001 in the amount of $1,410,000 for rehabilitation of the Airport's terminal apron. (Compl. ¶ 61.)  Shortly thereafter, the Committee to Stop Airport Expansion (the "Committee"), an unincorporated association of residents living near the Airport, commenced several legal proceedings in an attempt to halt development of the Airport.  In 2003, the Committee sued the FAA and the Department of Transportation in this District, challenging the legality of AIP grants to the Town dating back to 1994 (the "Committee Action").  See Comm. to Stop Airport Expansion, et al. v. Dep't of Transp., et al., No. 03-CV-2634.  In short, the Committee alleged that the Airport's prior AIP grants were improper because the FAA approved them in the absence of a current airport layout plan, which the AAIA requires before the FAA may award an AIP grant.  (See Comm. Action Compl. ¶¶ 89-96 (citing 49 U.S.C. § 47107(a)(16) ("The Secretary of Transportation may approve a project grant application under [the AAIA] only if the Secretary receives written assurances, satisfactory to the Secretary, that . . . the airport owner or operator will maintain a current layout plan of the airport . . . .").)  According to the Committee, the Airport's 2001 layout plan, which the FAA approved, was not current because several projects undertaken at the Airport since 1989 were not reflected in the 2001 layout plan.  (See Comm. Action Compl. ¶¶ 93-94.)  The Committee Action sought to vacate the 2001 layout plan

9

and to enjoin the award of any additional AIP grants so long as
the Town lacked a current and valid airport layout plan.  (See
Comm. Action Compl. ¶¶ 52, 57-88.)

In 2005, the Committee and the United States Government
executed a settlement agreement resolving the Committee Action, as
well as other actions the Committee commenced in other forums (the
"2005 Settlement Agreement").  (Pilsk Decl., Docket Entry 38-6,
Ex. 3.)  Under Paragraph 7 of the 2005 Settlement Agreement, the
FAA agreed that, with respect to the Airport, Grant Assurance 22(a)
(and three other grant assurances not relevant to this case)
"[would] not be enforced [by the FAA] beyond December 31, 2014."
(Pilsk Decl. Ex. 3 ¶ 7.)  Grant Assurance 22(a), entitled "Economic
Nondiscrimination," states:  "[The airport sponsor] will make the
airport available as an airport for public use on reasonable terms
and without unjust discrimination to all types, kinds and classes
of aeronautical activities, including commercial aeronautical
activities offering services to the public at the airport."
(Compl. Ex. A at 45.)

The 2005 Settlement Agreement further provided that,
aside from the four referenced Grant Assurances, "[a]ll other grant
assurances with respect to any grant awarded to East Hampton
Airport . . . shall be enforced in full."  (Pilsk Decl. Ex. 3 ¶ 7.)
Finally, the 2005 Settlement Agreement provided that if the Town
was awarded any additional AIP grants after the effective date of

10

SPA-11

the 2005 Settlement Agreement (April 29, 2005), then all Grant Assurances "shall be enforced in full" in connection with that new funding. (Pilsk Decl. Ex. 3 ¶ 7.)

The Town was not a party to the 2005 Settlement Agreement. Additionally, although this Court so-ordered the parties' stipulation dismissing the Committee Action, the Court did not so-order the 2005 Settlement Agreement, nor did the stipulation of dismissal incorporate by reference the terms of the 2005 Settlement Agreement. (See Comm. Action, Docket Entry 38.)

In December 2011, then-U.S. Representative Timothy Bishop ("Bishop") submitted a list of questions to the FAA probing the legal effect of the Town's Grant Assurances on its ability to enact noise and access regulations at the Airport. (Pilsk Decl. Ex. 2.) The FAA responded in an unsigned writing in 2012 (the "Bishop Responses"). (Pilsk Decl. Ex. 1.) The Bishop Responses stated that due to the 2005 Settlement Agreement, the FAA would not, as of December 31, 2014, "initiate or commence an administrative grant enforcement proceeding in response to a complaint from aircraft operators . . . or seek specific performance of Grant Assurances 22a, 22h, and 29," unless and until the FAA awarded a new AIP grant to the Town. (Pilsk Decl. Ex. 1 at 1.)

In addition, although the 2005 Settlement Agreement made no mention of ANCA, the Bishop Responses stated that "[t]he FAA's

11

agreement not to enforce also mean[t] that unless the town wishe[d] to remain eligible to receive future grants of Federal funding, it [was] not required to comply with [ANCA] . . . in proposing new airport noise and access restrictions." (Pilsk Decl. Ex. 1 at 1.)

Congress passed ANCA in 1990, directing the Secretary to "establish[ ] by regulation a national aviation noise policy" that (1) "considers . . . the phaseout and nonaddition of stage 2 aircraft," 49 U.S.C. § 47523(a), and (2) "establish[es] by regulation a national program for reviewing airport noise and access restrictions on the operation of stage 2 and stage 3 aircraft," 49 U.S.C. § 47524(a).[7]  Under Section 47524(b) of ANCA, an "airport noise or access restriction" may not "include restriction on the operation of stage 2 aircraft" unless and until the airport operator publishes the proposed restriction and other information for public comment at least 180 days before the effective date of the proposed restriction.  49 U.S.C. § 47524(b).  Under Section 47524(c), a restriction affecting a Stage 3 aircraft is effective only if it "has been agreed to by the airport proprietor and all aircraft operators" or has been "approved by the Secretary."  49 U.S.C. § 47524(c).  Under ANCA, the only consequences for failing to comply with Section 47524 are that the

---

[7] The FAA has classified aircraft into "Stages," according to how much noise they produce, from "Stage 1" being the noisiest to "Stage 4" being the quietest.  See 14 C.F.R. § 36.1(f).

SPA-13

airport "may not (1) receive money [under the AAIA]; or (2) impose a passenger facility charge under [49 U.S.C. § 40117]." 49 U.S.C. § 47526.

On January 29, 2015, Plaintiffs FOEHA, Analar, HAI, HeliFlite, and Liberty filed the FAA Action, principally alleging that the FAA exceeded its statutory authority and violated its statutory obligations when it agreed in the 2005 Settlement Agreement not to enforce Grant Assurance 22(a).  See Friends of the E. Hampton Airport, Inc., et al. v. F.A.A., et al., No. 15-CV-0441 (E.D.N.Y.).  The FAA Action seeks declaratory and injunctive relief that: (1) the FAA is statutorily obligated to ensure that the Town complies with Grant Assurance 22(a) until September 2021, i.e., twenty years from the date the Town last accepted an AIP grant; (2) neither the 2005 Settlement Agreement nor the FAA's interpretation of the 2005 Settlement Agreement in the Bishop Responses can restrain the FAA from carrying out its statutorily imposed duties under the AAIA to enforce the Grant Assurances; and (3) the Bishop Responses' one-sentence statement about ANCA, i.e., that the Town purportedly need not comply with ANCA, is contrary to law.  (FAA Action Compl. ¶¶ 82–114, Prayer for Relief.)[8]

---

[8] The Committee has filed a motion to intervene in the FAA Action, which was fully briefed on June 12, 2015.  This motion will be the subject of a future, separate order.

13

SPA-14

By the time the FAA Action was filed, the Town already began its efforts to enact noise regulations at the Airport. According to the Town, prior to receiving the Bishop Responses, it felt constrained by its understanding that Grant Assurance 22(a) limited its ability to enact noise and access restrictions until 2021. (<u>See</u> Def.'s Opp. Br., Docket Entry 38, at 4; Zornberg Decl., Docket Entry 36, Ex. A.)  However, after receiving the FAA's statement in the Bishop Responses that it would not enforce Grant Assurance 22(a) beyond 2014, the Town began exploring ways to alleviate the perceived noise problem at the Airport.  Over the course of 2014 and early 2015, the Town reviewed old flight data, collected new data, commissioned new noise studies, and hired consultants to assist the Town.  (<u>See</u> Cantwell Decl., Ex. 1.)

On February 27, 2015, Town representatives met with senior FAA officials to discuss proposed access restrictions. (Cantwell Decl. ¶ 21.)  They briefed the FAA on the range of noise controls the Town was considering and expressed that the Town was relying on the statements in the Bishop Responses that the FAA would not enforce Grant Assurance 22(a) beyond 2014 and that the Town need not comply with ANCA.  (Cantwell Decl. ¶ 22.)  On April 16, 2015, following a public hearing, but apparently without the approval of the FAA, the Town adopted the Town Laws.

IV.   Plaintiffs' Claims and Procedural History

Plaintiffs then commenced this action on April 21, 2015. As noted, Plaintiffs claim that the Town Laws are preempted by ANCA and the AAIA and constitute an unlawful restraint on interstate commerce in violation of the Commerce Clause.  On April 27, 2015, Plaintiffs filed a letter motion to consolidate this action with the FAA Action for all purposes pursuant to Federal Rule of Civil Procedure 42.  (Docket Entry 14.)

On April 29, 2015, Plaintiffs filed a motion for a temporary restraining order enjoining enforcement of the Town Laws pending resolution of this action and the FAA Action.  (Docket Entry 19.)  On May 18, 2015, the Court held a hearing on Plaintiffs' motion for a temporary restraining order, during which the Court and the parties agreed that the Court should construe Plaintiffs' motion as one for a preliminary injunction.  (See Docket Entry 51.)  The Town agreed to delay enforcement of the Town Laws until today, June 26, 2015, so that the Court would have sufficient time to consider the matter.

Plaintiffs' motion for a preliminary injunction relies solely on their preemption claims.  They specifically contend that the Town Laws are preempted by ANCA because the Town did not comply with ANCA's procedural requirements for adopting noise and access restrictions affecting Stage 2 and Stage 3 aircrafts.  (See Compl. ¶¶ 72-74.)  With respect to the AAIA, Plaintiffs contend that the

15

SPA-16

Town Laws are preempted by Section 47107 of the AAIA because the laws violate three of the Town's Grant Assurances: (1) Grant Assurances 19(a), entitled "Operation and Maintenance," which states that the airport "shall be operated at all times in a safe and serviceable condition and in accordance with the minimum standards as may be required or prescribed by applicable Federal, state and local agencies for maintenance and operation," (Compl. Ex. A. at 44-45); (2) Grant Assurance 22(a), which, as noted above, requires the airport sponsor to "make the airport available as an airport for public use on reasonable terms," (Compl. Ex. A. at 45); and (3) Grant Assurance 23, entitled "Exclusive Rights," which prohibits the airport sponsor from permitting any "exclusive right for the use of the airport by any person," (Compl. Ex. A at 47.)

<u>DISCUSSION</u>

The Court will first address Plaintiffs' motion for a preliminary injunction before turning to their motion to consolidate.

I.   <u>Plaintiffs' Motion for a Preliminary Injunction</u>

A.   <u>Legal Standard</u>

Generally, "[t]o obtain a preliminary injunction, the moving party must demonstrate '(1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping

16

decidedly in the plaintiff's favor; and (3) that the public's interest weighs in favor of granting an injunction." Red Earth LLC v. United States, 657 F.3d 138, 143 (2d Cir. 2011) (quoting Metro. Taxicab Bd. of Trade v. City of N.Y., 615 F.3d 152, 156 (2d Cir. 2010)). However, where, as in this case, "'the moving party seeks a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard.'" Metro. Taxicab Bd., 615 F.3d at 156 (quoting Cnty. of Nassau v. Leavitt, 524 F.3d 408, 414 (2d Cir. 2008)).

Additionally, in this Circuit, a more exacting standard--one which requires the movant to demonstrate a "clear" or "substantial" likelihood of success on the merits--applies in two situations. See Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35 n.4 (2d Cir. 2010) (collecting cases). First, "[a] heightened 'substantial likelihood' standard" applies where the requested injunction: "(1) would provide the plaintiff with 'all the relief that is sought' and (2) could not be undone by a judgment favorable to defendants on the merits at trial." Mastrovincenzo v. City of N.Y., 435 F.3d 78, 90 (2d Cir. 2006) (quoting Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 34-35 (2d Cir. 1995)). Second, a "mandatory" injunction, that is, one that "alter[s] the

17

status quo by commanding some positive act," as opposed to a "prohibitory" injunction, which "seeks only to maintain the status quo pending a trial on the merits," "should issue 'only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.'"  Tom Doherty Assocs., 435 F.3d at 34 (quoting Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir. 1985)).

Citing Sussman v. Crawford, 488 F.3d 136 (2d Cir. 2007), the Town urges the Court to apply the heightened likelihood of success standard here.  (Def.'s Opp. Br. at 6.)  In Sussman, the plaintiffs sought to compel the United States Military Academy at West Point to allow a demonstration during a graduation ceremony. 488 F.3d at 137.  In this case, however, the requested injunction would prohibit, rather than compel government action, because the injunction would only enjoin enforcement of the Town Laws.  See Mastrovincenzo, 435 F.3d at 90 ("On its face, the injunction clearly prohibits, rather than compels, government action by enjoining the future enforcement of § 20-453 against plaintiffs."); Davis v. Shah, No. 12-CV-6134, 2012 WL 1574944, at *5 (W.D.N.Y. May 3, 2012) ("[T]he Court views the injunction being sought as prohibitory, rather than mandatory, since it merely seeks to restore and maintain the relationship that existed between the parties prior to the enactment of the challenged statute.").

18

SPA-19

Additionally, in contrast to Sussman, where an injunction would have permitted the plaintiffs to hold a large protest, thus rendering the dispute moot after entry of an injunction, the requested injunction here would not create a "particularly drastic or irreversible change in the status quo." Mastrovincenzo, 435 F.3d at 90. Instead, an injunction would simply restore and maintain the situation that existed prior to adoption of the Town Laws. The ultimate question of whether the Town may impose access restrictions to the Airport could still be resolved on the merits in the Town's favor. See id. (holding that an injunction did not "effect[ ] a particularly drastic or irreversible change in the status quo" because "the ultimate question of whether New York City [could] impose . . . licensing requirements on vendors of clothing painted with graffiti remain[ed] ripe for resolution on the merits, and the injunction did not irreversibly affect the rights of the parties"). Accordingly, since the requested injunction is prohibitory and would merely preserve the status quo, Plaintiffs are not required to meet the more exacting likelihood of success standard.

B.   Private Enforcement of the AAIA and ANCA

Before addressing the requirements for a preliminary injunction, the Court first considers whether Plaintiffs may proceed against the Town based on the Town's alleged violations of ANCA and the AAIA. As noted, Section 47524 of ANCA imposes certain

19

SPA-20

procedural requirements before an airport proprietor can adopt an "airport noise or access restriction" affecting Stage 2 and Stage 3 aircrafts. 49 U.S.C. § 47524(b), (c). Under Section 47107(a) of the AAIA, the Secretary of Transportation, through the FAA, is authorized to award airport improvement grants, but only if the airport proprietor provides the Secretary with Grant Assurances regarding airport operations. 49 U.S.C. § 47107(a). There is no dispute that the Town did not comply with ANCA's procedural requirements before adopting the Town Laws even though they affect operations of Stage 2 and Stage 3 aircrafts, and Plaintiffs argue that the Town Laws violate Grant Assurances 19(a), 22(a), and 23. The Supremacy Clause of the United States Constitution provides that federal statutes preempt contrary state and local laws. See Nat'l Helicopter Corp. of Am. v. City of N.Y., 137 F.3d 81, 88 (2d Cir. 1998) ("National Helicopter II") ("The Supremacy Clause of the United States Constitution invalidates state and local laws that 'interfere with or are contrary to, the laws of congress.'" (quoting Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 317, 101 S. Ct. 1124, 1130, 67 L. Ed. 2d 258 (1981)). Accordingly, Plaintiffs seek to enforce the Supremacy Clause by striking down the Town Laws and giving effect to ANCA's procedural requirements and the Town's Grant Assurances under the AAIA.

The Town urges the Court to deny Plaintiffs' request for an injunction on the ground that neither ANCA nor the AAIA creates

20

SPA-21

a private right of action. (Def.'s Br., Docket Entry 38 at 11-12.) That ANCA and the AAIA do not create private rights of action is beyond dispute. Courts have uniformly held that private parties have no right to sue in federal court to enforce the provisions of ANCA or the AAIA. See, e.g., McCasland v. City of Castroville, 514 F. App'x 446, 448 (5th Cir. 2013) ("As several circuit courts have held, and as Plaintiffs appear to concede, 49 U.S.C. § 47107 and its predecessor statute do not create a private right of action for parties aggrieved by alleged discrimination."); W. Air Lines, Inc. v. Port Auth. of N.Y. & N.J., 817 F.2d 222, 225 & n.4 (2d Cir. 1987) (holding that 49 U.S.C. § 2210(a), the previous codification of Section 47107(a), did not create an private right of action); Northwest Airlines, Inc. v. Kent, Mich., 955 F.2d 1054, 1058-59 (6th Cir. 1992) (same); L-3 Commc'ns Integrated Sys., L.P. v. City of Greenville, No. 11-CV-2294, 2012 WL 3941766, at *2 (N.D. Tex. Sept. 5, 2012) ("The AAIA regulations do not provide for a private right of action and therefore cannot serve as an independent basis for jurisdiction."); Horta, LLC v. City of San Jose, No. 02-CV-4086, 2008 WL 4067441, at *4 (N.D. Cal. Aug. 28, 2008) (suggesting that "Congress did not intend to create a private right of action for ANCA violations" because "ANCA contains its own enforcement mechanism, to be administered by the Secretary of Transportation"); Airborne Tactical Advantage Co., LLC v. Peninsula Airport Comm'n, No. 05-CV-0166, 2006 WL 753016, at *1

21

SPA-22

(E.D. Va. Mar. 21, 2006) ("Courts interpreting § 47107 have uniformly held that airport users have no right to bring an action in federal court claiming a recipient airport's violation of the § 47107 grant assurances . . . ."); Tutor v. City of Hailey, No. 02-CV-0475, 2004 WL 344437, at *8 (D. Idaho Jan. 20, 2004) ("[N]o implied private right of action exists under ANCA."); E. Hampton Airport Prop. Owners Ass'n, Inc. v. Town Bd. of Town of E. Hampton, 72 F. Supp. 2d 139, 147 (E.D.N.Y. 1999) ("Section 47107 [of the AAIA] does not give rise to a private right of action."). Plaintiffs do not dispute this long line of precedent.  Thus, ANCA requires certain procedural hurdles prior to the enactment of noise and access restrictions on Stage 2 and Stage 3 aircrafts, and the AAIA requires the recipient of airport improvement funds to comply with the AAIA's Grant Assurances, but neither statute permits Plaintiffs to sue to enforce compliance in federal court.

Plaintiffs therefore seek to sue directly under the Supremacy Clause.  However, the Supremacy Clause also does not supply a private right of action.  As the Supreme Court recently clarified in Armstrong v. Exceptional Child Center, Inc., 135 S. Ct. 1378, 1383, 191 L. Ed. 2d 471 (2015), the Supremacy Clause merely "creates a rule of decision . . . .  It instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so."  Thus, the Supremacy Clause "is not

22

SPA-23

the 'source of any federal rights,' and certainly does not create a cause of action." Id. (quoting Golden State Transit Corp. v. Los Angeles, 493 U.S. 103, 107, 110 S. Ct. 444, 449, 107 L. Ed. 2d 420 (1989)).

Nevertheless, this is not to say that federal courts lack equitable jurisdiction to enjoin the implementation of preempted state legislation: "[F]ederal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law." Id. at 1384; see also id. ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity . . . ."); Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96 n.14, 103 S. Ct. 2890, 2899 n.14, 77 L. Ed. 2d 490 (1983) ("A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve."). Accordingly, Plaintiffs may be able to invoke this Court's equity jurisdiction to enjoin the allegedly preempted Town Laws regardless of whether ANCA, the AAIA, or the Supremacy Clause creates a private right of action. See Armstrong, 135 S. Ct. at 1391 (Sotomayor, J., dissenting) ("[The Court has] thus long entertained suits in which a party seeks prospective equitable

23

protection from an injurious and preempted state law without regard to whether the federal statute at issue itself provided a right to bring an action." (collecting cases)).

But, as Armstrong counsels, even "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations."  135 S. Ct. at 1385 (holding that private Medicaid providers could not sue to enforce Section 30(A) of the Medicaid Act because Congress "implicitly preclude[d] private enforcement of § 30(A)"); see also Seminole Tribe of Florida v. Florida, 517 U.S. 44, 74, 116 S. Ct. 1114, 1132, 134 L. Ed. 2d 252 (1996) ("Where Congress has created a remedial scheme for the enforcement of a particular federal right, we have, in suits against federal officers, refused to supplement that scheme with one created by the judiciary.").

Here, in this Court's view, Congress intended to foreclose equitable enforcement of the AAIA's Grant Assurances.  A fair reading of the AAIA indicates that Congress intended to place authority for the enforcement of the AAIA's Grant Assurances exclusively in the hands of the Secretary of Transportation through a comprehensive administrative enforcement scheme.  For starters, Section 47107(a) authorizes the Secretary to approve a grant application "if the Secretary receives written assurances, satisfactory to the Secretary."  49 U.S.C. § 47107(a) (emphasis added).  If the FAA awards a grant, the Grant Assurances then

SPA-25

"become a binding contractual obligation between the airport sponsor and the Federal government." Pac. Coast Flyers, Inc., 2005 WL 1900515, at *11. The Secretary is then responsible for ensuring compliance with the Grant Assurances. See 49 U.S.C. § 47107(g). And to ensure compliance, Congress mandated that the Secretary "prescribe requirements for sponsors that the Secretary considers necessary." 49 U.S.C. § 47107(g) (emphasis added). Additionally, Section 47122 states that the Secretary "may take action the Secretary considers necessary to carry out [the AAIA], including conducting investigations and public hearings, prescribing regulations and procedures, and issuing orders." 49 U.S.C. § 47122(a). Based on all of these elements of the AAIA, which place the responsibility of Grant Assurance compliance squarely with the Secretary, the Court finds that Congress at least implicitly precluded federal courts from exercising equity jurisdiction to enforce the AAIA's Grant Assurances.

The Court's holding today does not leave an airport user without adequate recourse, however. The FAA's enforcement regulations permit a party "directly and substantially affected" by an airport sponsor's alleged noncompliance with a Grant Assurance to file a formal complaint with the FAA. 14 C.F.R. § 16.23(a). If the pleadings demonstrate a "reasonable basis for further investigation," the FAA investigates the allegations, after which the Director of the Office of Airport Safety and

SPA-26

Standards issues an "initial determination." 14 C.F.R. §§ 16.29(a), 16.31(a). If the Director dismisses the complaint, the interested party can file an administrative appeal to the Associate Administrator for Airports, who examines the existing record and issues a final decision without a hearing. 14 C.F.R. §§ 16.31(c), 16.33(a)(1). This final decision is then appealable, but only to a federal court of appeals. 49 U.S.C. § 46110(a); 14 C.F.R. § 16.247(a).

The FAA's administrative grant enforcement procedure is not insignificant. Indeed, "[c]ourts interpreting § 47107 have uniformly held that airport users have no right to bring an action in federal court claiming a recipient airport's violation of the § 47107 grant assurances until that claim has been raised with the FAA." Airborne, 2006 WL 753016, at *1 (collecting cases); see also Nw. Airlines, Inc. v. Cnty. of Kent, Mich., 955 F.2d 1054, 1059 (6th Cir. 1992) (holding that "all claims against the defendants under the AAIA were properly dismissed for failure to exhaust administrative remedies").

However, the Court recognizes that this case is complicated by the fact that the FAA agreed in the 2005 Settlement Agreement not to enforce Grant Assurance 22(a). (Pilsk Decl. Ex. 3 at 5.) On its face, this agreement appears to violate the Secretary's statutorily mandated duty to ensure compliance with the AAIA. The FAA's own decisions and determinations support this

SPA-27

conclusion.    See Platinum Aviation & Platinum Jet Ctr. BMI v. Bloomington-Normal Airport Auth., FAA Docket No. 16-06-09, 2007 WL 4854321, at *15 (Nov. 28, 2007) ("[The] FAA can neither bargain away the rights of access to public-use taxiways and movement areas nor waive the grant assurances of the Respondent.  [The] FAA is required to enforce the federal statutes to protect the federal interest in the Airport.  The Part 16 process ensures respondents comply with their agreements with the federal government to protect and serve the public interest."); In re Compliance with Fed. Obligations by the City of Santa Monica, Cal., FAA Docket 16-02-08, 2008 WL 6895776, at *26 (May 27, 2008) ("The FAA may not by agreement waive its statutory enforcement jurisdiction over future cases.").  Thus, the Court is sorely tempted to issue a ruling that the FAA is statutorily obligated to enforce the Town's Grant Assurances notwithstanding its agreement not to enforce in the 2005 Settlement Agreement.  However, the Court will not rule on the scope of the FAA's duties without first providing the FAA an opportunity to be heard.  Currently, the FAA's response to the Complaint in the FAA Action is due on July 8, 2015.  After the FAA responds, the Court may order additional briefing and/or schedule a hearing to address this issue.  In the meantime, Plaintiffs may, if they wish, file a complaint with the FAA regarding the Town's alleged failure to comply with its Grant Assurances.

SPA-28

Finally, the Court will entertain Plaintiffs' preemption claim with respect to ANCA. With respect to ANCA, Plaintiffs simply seek a declaration and injunctive relief that ANCA expressly preempts any noise or access restriction on a Stage 2 or Stage 3 aircraft unless the airport proprietor follows ANCA's procedural requirements. This claim does not raise the same jurisdictional concerns as Plaintiffs' AAIA claims. There is nothing in the text or structure of ANCA indicating that Congress intended to preclude a federal court sitting in equity from entertaining Plaintiffs' preemption challenge, nor is there an administrative enforcement proceeding that would permit Plaintiffs to pursue their claim. The Court will now turn to the requirements of Plaintiffs' motion for a preliminary injunction.

    C. <u>Irreparable Harm</u>

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" <u>Faiveley Transp. Malmo AB v. Wabtec Corp.</u>, 559 F.3d 110, 118 (2d Cir. 2009) (quoting <u>Rodriguez v. DeBuono</u>, 175 F.3d 227, 233–34 (2d Cir. 1999)). Accordingly, "'the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered.'" <u>Grand River Enter. Six Nations, Ltd. v. Pryor</u>, 481 F.3d 60, 66 (2d Cir. 2007) (quoting <u>Freedom Holdings, Inc. v. Spitzer</u>, 408 F.3d 112, 114 (2d Cir. 2005)). To meet the

28

irreparable harm requirement, Plaintiffs "'must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.'" Faiveley, 559 F.3d at 118 (quoting Grand River, 481 F.3d at 66). "'Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances.'" Id. (quoting Moore v. Consol. Edison Co. of N.Y., 409 F.3d 506, 510 (2d Cir. 2005)).

"A 'substantial loss of business,' particularly where there is a threat of bankruptcy, constitutes irreparable injury sufficient to satisfy this standard." Nat'l Helicopter Corp. of Am. v. City of N.Y., 952 F. Supp. 1011, 1018 (S.D.N.Y. 1997) ("National Helicopter I") (quoting Doran v. Salem Inn, Inc., 422 U.S. 922, 932, 95 S. Ct. 2561, 2568, 45 L. Ed. 2d 648 (1975)), aff'd in part, rev'd in part, Nat'l Helicopter II, 137 F.3d 81 (2d Cir. 1998). "Major disruption of a business can be as harmful as its termination and thereby constitute irreparable injury." Petereit v. S.B. Thomas, Inc., 63 F.3d 1169, 1186 (2d Cir. 1995) (remanding with instructions that the plaintiffs "may show that the lost profits . . . are of such magnitude as to threaten the viability of their businesses"). Additionally, "[t]he threat that a business will suffer a significant loss of 'good will'--a matter

SPA-30

not easily quantified--is particularly suited to a claim for injunctive relief." Nat'l Helicopter I, 952 F. Supp. at 1018.

Plaintiffs argue that they will suffer irreparable harm absent an injunction because the Town Laws will: (1) "cause severe economic harm" that will "threaten the continued existence of some Plaintiffs"; and (2) "cause incalculable and irreversible damage to Plaintiffs' goodwill, relationships, market share, and reputation." (Pls.' Br. at 8-11.) Plaintiffs have submitted various affidavits from executives and high-ranking employees to support these allegations. (See Renz Decl., Docket Entry 22; Jungck Decl., Docket Entry 23; Vellios Decl., Docket Entry 24; Herbst Decl., Docket Entry 25; Carlson Decl., Docket Entry 28; Ashton Decl., Docket Entry 29.) A review of these affidavits demonstrates that at least some Plaintiffs have demonstrated irreparable harm absent an injunction.

The majority of the aircrafts that many of the Plaintiffs use for their charter services to the Airport are subject to the Town Laws' Noisy Aircraft definition. (Renz Decl. ¶ 20 (six of Analar's seven helicopters); Ashton Decl. ¶ 15 (all ten of AAG's helicopters); Carlson Decl. ¶ 18 (HeliFlite's entire fleet); Vellios Decl. ¶ 11 (all eleven of Liberty's helicopters). Thus, it cannot be seriously argued that the Town Laws, particularly their One-Trip Limit, will not cause substantial business losses that might threaten Plaintiffs' existence. For example, according

30

SPA-31

to Analar's president, Michael Renz, flights to and from the Airport account for fifty-five percent of Analar's revenue, and over seventy percent of its passengers fly to and from the Airport. (Renz Decl. ¶¶ 9, 11.) He estimates that sixty-five percent of Analar's flights will be prohibited under the Town Laws. (Renz. Decl. ¶ 20.)

Moreover, as noted, in addition to providing charter services, AAG and HeliFlite manage "fractional aircraft ownership programs," which involve selling partial ownership or leasehold interests of a helicopter to private individuals who wish to operate their own helicopter using AAG and HeliFlite as managers. (Compl. ¶¶ 14, 17.) According to AAG's president, its prospective fractional owners have delayed purchasing shares and some of its existing fractional owners have delayed renewing their shares pending the outcome of this matter. (Ashton Decl. ¶ 28.) In this Court's view, this would result not only result in lost revenue, but also damage to AAG's reputation and good will with its present and prospective clients. HeliFlite likely faces the same predicament. (Carlson Decl. ¶¶ 26-27.) Similarly, three of Analar's seven helicopters are owned by third-party individuals with personal travel needs to and from the Airport, some of who have advised Analar that they will sell their helicopters if the Town Laws go into effect. (Renz Decl. ¶¶ 21, 24.) This undoubtedly would constitute a major business disruption because Analar would

31

not only lose its management business, but also the use of those
helicopters for other customers.  Additionally, some Plaintiffs
believe that they will have to reduce their fleets and terminate
many of their employees, including highly-skilled pilots.  (See
Renz Decl. ¶¶ 17, 25; Vellios Decl. ¶ 20; Ashton Decl. ¶ 24.)  In
a highly-specialized industry, the loss of operating equipment and
pilots could be difficult to replace.

In sum, the Town Laws undoubtedly will impose on some of
the Plaintiffs substantial business losses, major operational
disruptions, and losses of good will that could be difficult to
quantify.  Plaintiffs have therefore demonstrated irreparable harm
absent an injunction.[9]

---

[9] Additionally, the Court notes that money damages may not be
available to at least one Plaintiff, Liberty, which is a New
York corporation.  Money damages are unavailable for its
preemption claims.  As previously noted, the AAIA, ANCA, and the
Supremacy Clause do not create private causes of action.  (See
supra pp. 20-22.)  Nor is a claim available for violations of
the AAIA or ANCA under 42 U.S.C. § 1983.  See Scott Aviation,
Inc. v. DuPage Airport Auth., 393 F. Supp. 2d 638, 647 (N.D.
Ill. 2005) (holding that a plaintiff may not base a Section 1983
claim upon a violation of the AAIA); Tutor, 2004 WL 344437, at
*10 n.4 (same, but for ANCA).  And although Plaintiffs' Commerce
Clause claim might support a money damages award under 42 U.S.C.
§ 1983, see Dennis v. Higgins, 498 U.S. 439, 111 S. Ct. 865, 112
L. Ed. 2d 969 (1991) (recognizing that Commerce Clause claims
are actionable under 42 U.S.C. § 1983), these damages clearly
would be limited to those incurred in connection with an
unconstitutional restraint on interstate commerce, see Town of
Southold v. Town of E. Hampton, 477 F.3d 38, 47 (2d Cir. 2007)
(stating that the "[D]ormant Commerce Clause . . . limits the
power of local governments to enact laws affecting interstate
commerce").  Thus, being a New York corporation, Liberty likely

D.   Likelihood of Success on the Merits

Having found irreparable harm absent an injunction, the Court now turns to the merits of this case.  As noted, the Supremacy Clause provides that federal statutes preempt contrary state and local laws.  See Nat'l Helicopter II, 137 F.3d at 88 ("The Supremacy Clause of the United States Constitution invalidates state and local laws that 'interfere with or are contrary to, the laws of congress.'" (quoting Chicago & N.W. Transp. Co., 450 U.S. at 317, 101 S. Ct. at 1130).  Plaintiffs contend that the Town Laws are invalid because ANCA "expressly preempts local proprietors from imposing any noise or access restrictions on any aircraft classified by the FAA as a 'Stage 2' or 'Stage 3' aircraft unless the proprietor has first complied with ANCA's stringent requirements."  (Pls.' Br. at 14 (emphasis omitted).) Alternatively, Plaintiffs argue that the laws are preempted because they unreasonable, arbitrary, and discriminatory.  (Pls. Br. at 21-25.)

The Town responds that ANCA does not expressly preempt local noise regulations.  Rather, the Town reads ANCA to provide airport proprietors with a choice: comply with ANCA's requirements or lose eligibility for federal airport improvement grants. (Def.'s Br. at 14-15.)  As long as an airport proprietor's noise

---

would not be entitled to money damages under the Commerce Clause.

SPA-34

regulation is reasonable, non-arbitrary, and non-discriminatory, the Town contends, such regulation constitutes a valid exercise of the airport proprietor's proprietary rights in the airport. (Def.'s Br. at 14-15.)

As discussed below, the Court agrees with the Town that ANCA does not expressly preempt all airport proprietors from adopting access restrictions before complying with ANCA's procedural requirements. However, for the reasons explained below, the Court also finds that on the record before it, Plaintiffs have demonstrated that the One-Trip Limit is not reasonable.

1.   Whether ANCA Preempts the Town Laws

Under the Airline Deregulation Act ("ADA"), Congress has expressly preempted state and local regulations "related to a price, route or service of an air carrier."   49 U.S.C. § 41713(b)(1)).   However, Congress also expressly stated that the ADA's preemptive effect does not apply to regulations passed by state and local authorities in the course of "carrying out [their] proprietary powers and rights."  49 U.S.C. § 41713(b)(3).  "Under this 'cooperative scheme,' Congress has consciously delegated to state and municipal proprietors the authority to adopt rational regulations with respect to the permissible level of noise created by aircraft using their airports in order to protect the local

34

SPA-35

population." Nat'l Helicopter II, 137 F.3d at 88 (collecting cases and legislative history).

Thus, "federal courts have recognized federal preemption over the regulation of aircraft and airspace, subject to a complementary though more 'limited role for local airport proprietors in regulating noise levels at their airports.'" Id. (quoting City and County of San Francisco v. F.A.A., 942 F.2d 1391, 1394 (9th Cir. 1991)). Known as the "proprietor exception," it permits a local municipality, acting in its proprietary capacity, as opposed to its police power, to adopt "'reasonable, nonarbitrary and non-discriminatory' regulations of noise and other environmental concerns at the local level." Id. (quoting British Airways Bd. v. Port Auth. of N.Y., 558 F.2d 75, 84 (2d Cir. 1977)); see also Glob. Int'l Airways Corp. v. Port Auth. of N.Y. & N.J., 727 F.2d 246, 248 (2d Cir. 1984) ("[S]tates and localities retain power in their capacity as airport proprietors to establish requirements as to the level of permissible noise created by aircraft using their airports."). The rationale for the proprietor exception is that since airport proprietors are liable for compensable takings from excessive aircraft noise, British Airways, 558 F.2d at 83 (citing Griggs v. Allegheny Cnty., 369 U.S. 84, 82 S. Ct. 531, 7 L. Ed. 2d 585 (1962)), fairness dictates that they should have the power to limit their liability by restricting access to their airports, see id. ("The right of the

35

SPA-36

proprietor to limit his liability by restricting the use of his airport has been thought a corollary of this principle.").

Plaintiffs do not dispute the existence of the proprietor's exception. Rather, they contend that when Congress enacted ANCA in 1990, it "displac[ed] local proprietors' authority to unilaterally impose restrictions." (Pls.' Br. at 15.) The Court disagrees. Plaintiffs are correct that ANCA directed the Secretary of Transportation to "establish[ ] by regulation a national program for reviewing airport noise and access restrictions on the operation of stage 2 and stage 3 aircraft." 49 U.S.C. § 47524(a). However, under Section 47526 of ANCA, entitled, "Limitations for noncomplying airport noise and access restrictions," the only consequences for failing to comply with ANCA's review program are that the "airport may not--(1) receive money under [the AAIA]; or (2) impose a passenger facility charge under [49 U.S.C. § 40117]." 49 U.S.C. § 47524. This provision raises an obvious question. If Congress intended to preempt all airport proprietors from enacting noise regulations without first complying with ANCA, why would it also include an enforcement provision mandating the loss of eligibility for federal funding and the ability to impose passenger facility charges? The logical answer is that Congress intended to use grant and passenger facility charge restrictions to encourage, but not require, compliance with ANCA. Indeed, in National Helicopter II, the

36

SPA-37

Second Circuit affirmed a decision rendered by then-District Judge Sonia Sotomayor in which she applied the proprietor exception to uphold various noise regulations imposed by the City of New York on Manhattan's East 34th Street Heliport notwithstanding the fact that the plaintiff in that case presented the same ANCA-preemption argument that Plaintiffs assert here.  See Nat'l Helicopter II, 137 F.3d at 88; Nat'l Helicopter I, 952 F. Supp. at 1023. Accordingly, in line with National Helicopter II, this Court holds that ANCA did not displace the proprietor exception.[10]

        2.   Whether the Town Laws Are Reasonable, Non-Arbitrary, and Non-Discriminatory

Even though ANCA does not expressly preempt the Town Laws, to be constitutional under the proprietor exception, the laws still must be reasonable, non-arbitrary, and non-discriminatory.  Nat'l Helicopter II, 137 F.3d at 88 ("[T]he proprietor exception allows municipalities to promulgate 'reasonable, nonarbitrary and non-discriminatory' regulations of noise and other environmental concerns at the local level."

---

[10] The Court does note that the Airport is federally obligated since it accepted federal funds in 2001, and ANCA expressly states that it "does not affect . . . the authority of the Secretary of Transportation to seek and obtain legal remedies the Secretary considers appropriate, including injunctive relief."  49 U.S.C. § 47533.  The Court offers no opinion on whether or not the FAA has authority to enjoin the Town Laws on the basis that the Airport is still federally obligated and therefore would need to comply with ANCA's procedural requirements.

37

(quoting British Airways, 558 F.2d at 84)).  Regulations of noise "must avoid even the appearance of irrational or arbitrary action." Id. at 89.

For ease of reference, the Town Laws impose the following three access restrictions: (1) the Mandatory Curfew, which prohibits all aircraft from using the Airport between 11:00 p.m. and 7:00 a.m.; (2) the Extended Curfew, prohibiting "Noisy Aircraft" from using the Airport from 8:00 p.m. to 9:00 a.m.; and (3) the One-Trip Limit, a weekly limit prohibiting Noisy Aircraft from using the Airport more than two times per week during the months of May, June, July, August, and September.  See TOWN OF E. HAMPTON CODE § 75-38(B)-(C).

Plaintiffs argue that the Town Laws are unreasonable, arbitrary, and discriminatory on three grounds: (1) "the Town justified [the Town Laws] with deeply flawed data that are noncompliant with federal regulations," (Pls.' Br. at 22-23); (2) "The Town's 'Noisy Aircraft' standard is unreasonable because it is so extreme and excessive" and "is also arbitrary and discriminatory," (Pls.' Br. at 23-24); and (3) the Town Laws "are unreasonable and conflict with federal law because they create potential safety problems," (Pls.' Br. at 24-25).  The Court will first address Plaintiffs' arguments regarding safety and the Town's data since both arguments are applicable to all three access restrictions.

38

SPA-39

With respect to safety, Plaintiffs contend that the Town Laws' curfews are unsafe because they impose financial and injunctive penalty provisions that could influence pilot decisions in an unsafe manner and also divert air traffic to nearby airports that are unable to handle an increased demand.  (Pls.' Br. at 24-25.)  However, on the record before the Court, there is no evidence that the mandatory curfews would force any pilot to operate his or her aircraft in an unsafe manner.  Plaintiffs' argument is purely speculative.  Plaintiffs also cite to an FAA decision in which the FAA found that a mandatory curfew imposing financial penalties and injunctions was unsafe, and therefore unreasonable, because it "'reache[d] into the cockpits of individual aircraft and interact[ed] with safety parameters affecting critical . . . decisions' by pilots." (Pls.' Br. at 24 (quoting FAA Decision on 14 CFR Part 161 Study – Proposed Runway Use Restriction at LAX (Nov. 7, 2014) (alterations and ellipsis in original)).[11]   However, in this case, the Town Laws include an exception for operational or medical emergencies.  See TOWN OF E.

---

[11] The FAA's LAX decision is available at: http://www.faa.gov/airports/environmental/airport_noise/part_161 /media/Final-Determination-LAX-Part%20161-Application-20141107.pdf.

SPA-40

HAMPTON CODE § 75-38(E).[12]  In this regard, the Court notes that the FAA has been aware that the Town intended to impose curfews at the Airport since at least the end of February this year.  If at any time the FAA believed that the curfews were unsafe, it could, and still can, attempt to regulate the Town Laws based on safety concerns.

Plaintiffs also argue that the Town Laws are unconstitutional because the Town justified the Town Laws based on flawed data not compliant with federal regulations.  Specifically, Plaintiffs contend that the FAA has established a single metric-- yearly day-night noise exposure level expressed in decibels ("DNL")--and "requires its use by all airports to justify any efforts to reduce airport noise by restricting aircraft access." (Pls.' Br. at 22.)  Plaintiffs are correct that the FAA has established the DNL metric with respect to submissions under ANCA

---

[12] Specifically, Section 75-38 states:

The restrictions of this section 75-38 shall not apply to any aircraft operational emergency, any medical emergency operation, whether by public or private aircraft, or to any operation by a government-owned aircraft, including, without limitation, police, emergency services, and military operations. In the case of an aircraft emergency or medical emergency operation, the operator shall submit a sworn statement to the Airport Manager within 24 hours of such operation attesting to the nature of the emergency and reason for the operation.

TOWN OF E. HAMPTON CODE § 75-38(E)

40

SPA-41

and the Airport Noise and Safety Act of 1979 ("ANSA"), 49 U.S.C. § 47502, et seq. See, e.g., Aircraft Owners & Pilots Ass'n v. City of Pompano Beach, FAA Docket 16-04-01, 2005 WL 3722717, at *28 (Dec. 15, 2005). However, here, the question is whether the Town acted appropriately under the proprietor exception, not ANCA or ANSA. In adopting the Town Laws, the Town considered formal complaints submitted through the Airport's formal complaint log, which yielded over 23,000 complaints. The Court recognizes that a large portion of these complaints came from a small number of households, but it cannot be argued that the Town lacked data to support a finding of a noise problem at the Airport, particularly given the large increase in helicopter traffic in recent years. Indeed, courts have affirmed the FAA's use of complaint data "as empirical data of a noise problem." Helicopter Ass'n Int'l, Inc. v. F.A.A., 722 F.3d 430, 436 (D.C. Cir. 2013).

Having found no evidence that the Town Laws are unsafe and that Plaintiffs have failed to demonstrate that the Town lacked sufficient noise data, the Court turns to the Mandatory Curfew. Aside from its argument that the Town relied on flawed data, Plaintiffs do not specifically argue that the Mandatory Curfew is unreasonable, arbitrary, or discriminatory. Accordingly, the Court will not preliminarily enjoin the Mandatory Curfew, a decision which is in line with precedent in this Circuit. See Nat'l Helicopter II, 137 F.3d at 89 (affirming district court's

41

SPA-42

decision to uphold weekday and weekend curfews because "[t]he protection of the local residential community from undesirable heliport noise during sleeping hours is primarily a matter of local concern and for that reason falls within the proprietor exception").

The Court now turns to the access restrictions applicable to "Noisy Aircraft." Plaintiffs first argue that the definition of "Noisy Aircraft" is "unreasonable because it is so extreme and excessive." (Pls.' Br. at 23.) In support of this argument, Plaintiffs submit expert declarations and other affidavits alleging that the Noisy Aircraft definition includes certain aircraft that a generally viewed as quiet. (See Shaffer Decl., Docket Entry 20, ¶ 36; Jungck Decl. ¶ 5; Brown Decl., Docket Entry 27, ¶ 22.) The Court disagrees with Plaintiffs. As noted, Noisy Aircraft is defined as "any airplane or rotorcraft for which there is a published Effective Perceived Noise in Decibels (EPNdb) approach (AP) level of 91.0 or greater." TOWN OF E. HAMPTON CODE § 75-38A(4)(a). The 91 EPNdb threshold appears to be a valid indicator of noise as it affects individuals. As the FAA has explained:

> EPNL is a single number measure of the noise of an individual airplane flyover that approximates laboratory annoyance responses. . . . The EPNL computation process effectively yields a time integrated annoyance level.

42

SPA-43

See FAA, Advisory Circular 36-4C, Noise Standards: Aircraft Type and Airworthiness Certification ¶ 192(a).[13]   Even if not all aircrafts are EPNdb certified, as Plaintiffs claim, this does not render the Noisy Aircraft definition arbitrary or discriminatory. For starters, Plaintiffs do not identify how many aircraft are not EPNDb certified.   Additionally, the Noisy Aircraft definition is based on noise, as opposed to restrictions based on weight or size, which courts have found to constitute unreasoned discrimination because they do not regulate based on noise.   See, e.g., Nat'l Helicopter II, 137 F.3d at 91 ("In this case, the City placed restrictions on certain aircraft because of their size--not the noise they make--despite evidence that larger helicopters are not necessarily noisier than smaller ones.   A regulation purporting to reduce noise cannot bar an aircraft on any other basis.").   Thus, Plaintiffs have not demonstrated that the 91 EPNdb threshold for Noisy Aircraft is arbitrary or discriminatory, at least at this stage of the litigation.   The Court therefore will not preliminarily enjoin the Extended Curfew that applies to Noisy Aircraft, for the same reasons stated with respect to the Mandatory Curfew.

---

[13] The Advisory Circular is available at:
http://www.faa.gov/documentLibrary/media/Advisory_Circular/AC36-4C.pdf.

SPA-44

However, the Court will preliminarily enjoin the One-Trip Limit as applied to Noisy Aircraft. This measure is drastic, considering the effect it poses on some of Plaintiffs' businesses, and there is no indication that a less restrictive measure would not also satisfactorily alleviate the Airport's noise problem. Accordingly, on the record before it, the Court will preliminarily enjoin the One-Trip Limit as not reasonable. In making this ruling, the Court has considered the fact that the Town's complaint data originated from a small percentage of the Town's residents.

E.    Balance of Hardships

"The balance of hardships inquiry asks which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided." Goldman, Sachs & Co. v. N. Carolina Mun. Power Agency No. One, No. 13-CV-1319, 2013 WL 6409348, at *8 (S.D.N.Y. Dec. 9, 2013) (internal quotation marks and citation omitted). Here, the balance of hardships tips in the Town's favor with respect to the Mandatory Curfew and Extended Curfew, as the Town's desire to protect its residents during sleeping hours clearly outweighs the inconvenience Plaintiffs may experience by having to minimize their flight schedules. However, with respect to the One-Trip Limit, the balance tips in Plaintiffs' favor in light of the fact that the One-Trip Limit will have a drastic impact on their businesses, and there is no indication in the Town's papers that a less restrictive measure would not also

44

SPA-45

satisfactorily alleviate the Town's noise problem.  Accordingly, Plaintiffs' motion for a preliminary injunction is GRANTED IN PART and DENIED IN PART.  It is GRANTED with respect to the Town Laws' One-Trip Limit and is DENIED with respect to the Mandatory Curfew and Extended Curfew.

## II.  Motion to Consolidate

Plaintiffs also seek to consolidate this action and the FAA Action for all purposes.  The Court, in its discretion, RESERVES JUDGMENT on this motion pending the filing of the FAA's response to the Complaint in the FAA Action.

### CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction enjoining enforcement of the Town Laws (Docket Entry 19) is GRANTED IN PART and DENIED IN PART.  It is GRANTED with respect to the One-Trip Limit and is DENIED with respect to the Mandatory Curfew and Extended Curfew.  The Court RESERVES JUDGMENT with respect to Plaintiffs' motion to consolidate (Docket Entry 14) pending the filing of the FAA's response to the Complaint in the FAA Action.

SO ORDERED.

/s/ JOANNA SEYBERT_____
Joanna Seybert, U.S.D.J.

Dated:    June __26__, 2015
          Central Islip, NY

45